IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN PATENT DEVELOPMENT | § | |
| CORPORATION LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 07-605 JJF |
| | § | |
| MOVIELINK LLC, | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S RESPONSE TO
## PLAINTIFF'S MOTION TO COMPEL

Defendant Movielink, LLC files this response to Plaintiff American Patent Development

Corporation LLC's ("APDC's") motion to compel discovery (D.I. 25) (the "Motion").

## INTRODUCTION

APDC's Motion never should have been filed. There is no good reason the parties could

not work together to resolve this dispute concerning just four categories of documents.

Movielink has agreed to produce, and indeed has produced and is continuing to produce, exactly

the types of documents that APDC identifies in the first three of the four categories of documents

described in its Motion, relating to technical information about the accused systems. Movielink

has even produced the computer source code for its systems, which is, not surprisingly,

proprietary, highly confidential, and highly detailed documentation of the systems.

With respect to the last of the four categories of documents addressed in APDC's Motion,

contrary to its Statement Under Local Rule 7.1.1, APDC again failed to make a reasonable effort

to reach agreement with Movielink. Indeed, Movielink understood the parties had reached a

resolution of the issue, specifically that APDC would solicit permission from USA Video so that

Movielink could produce documents *filed under seal* in the previous *USA Video v. Movielink*

litigation without risk of violating the protective order in that case. Assuming USA Video's permission, Movielink has no objection to producing the requested documents. Thus, APDC's counsel corresponded with USA Video on March 4 and March 10, with a copy to Movielink's counsel (Plaintiff's Opening Brief in Support of Motion to Compel Discovery (D.I. 27) ("Plaintiff's Brief") Exhibits J & K). Then, without warning that this approach was no longer satisfactory to APDC and without conferring with Movielink on this issue, APDC filed the Motion on March 14, in which it demands Movielink pay APDC's fees and costs.

Movielink submits that APDC's Motion should be denied in all respects.

## DISCUSSION

### A.    APDC's Own Delay.

Movielink was once a much larger company with significantly greater resources to search for and produce requested documents at a pace perhaps more to APDC's satisfaction. But because APDC's principal and named inventor on the patent at issue, Norton Garfinkle, delayed almost five years before complaining about Movielink's well-known movie download service, APDC finds Movielink at a fraction of the resources and workforce it once had. *See* Exhibit A hereto (Declaration of Bruce Anderson, Senior Vice President of Engineering & Operations for Movielink) at ¶¶ 6 & 10.

APDC filed this lawsuit in October 2007, even though Movielink's movie download service began in November 2002. Back then, Movielink was a joint venture of Paramount Pictures, Sony Pictures, MGM, Universal Studios, and Warner Bros. Studios (the "Initial Investors"). During the first year of the downloading service, and with much publicity and fanfare, tens of thousands of Movielink customers downloaded over 100,000 movies. *Id.* at ¶¶ 4-5. The Movielink service was no secret, to be sure.

2

By June 2006, it was public information that the Initial Investors were offering to sell Movielink. Blockbuster Inc. closed on its purchase of Movielink in August 2007. APDC filed this lawsuit in October 2007, just two months later but five years late. *See id.* at ¶¶ 7-9. For further detail, *see* Exhibit B hereto (Movielink, LLC's Supplemental Responses to Plaintiff's First Set of Interrogatories) at 5-7.

**B.    APDC's Document Requests.**

On December 21, 2007, APDC served its first set of 44 document requests. Request for Production No. 7 requested "all documents" relating to the accused systems; No. 12 requested "all documents" relating to certain software protocols; No. 13 requested "all documents" relating to how data is transmitted to the user in the accused systems; and No. 43 requested "all pleadings" filed in the *USA Video* litigation. Movielink objected to the overly broad and/or unduly burdensome nature of these requests, but agreed to produce a more limited category of responsive documents. *See, e.g.*, Plaintiff's Brief, Exhibit B.

**1.    Requests for Technical Documents.**

Request for Production Nos. 7, 12, and 13, relate to technical documents concerning the accused Movielink systems. On January 25, 2008, Movielink produced Movielink patents and the *USA Video* district court opinion describing relevant Movielink technology, including at a system architecture level. *See* Exhibit A hereto (Anderson Declaration) at ¶ 11. On March 13, Movielink produced to APDC's outside counsel a CD with the Movielink source code for the relevant systems. On March 14, Movielink produced expert reports from the *USA Video* litigation that details the architecture, topology, and delivery of content and license information using the relevant Movielink systems. Movielink produced further design documents related to the relevant systems on March 19 and this week. The individual at Movielink with the broadest

3

knowledge about documentation of the Movielink systems, Mr. Anderson, has been directly involved with identifying and providing the relevant documents, and he has provided all documents he has thus far been able to locate that are responsive to Document Request Nos. 7, 12 and 13. *Id.* at ¶¶ 11-13.

APDC's counsel apparently believes that Movielink must have a central repository of technical manuals documenting all aspects of the Movielink systems. *See* Plaintiff's Brief, Exhibit G (APDC correspondence insisting that "technical manuals" are "easily located by Movielink and do not require any formal search"). That belief is simply mistaken. Like many young companies with real operations and deadlines, Movielink has not had the luxury of time to document all the work its engineers have done over the years. Thus, Mr. Anderson confirms that "Movielink does not have substantial documentation of its systems nor a central repository for high-level documents about system architecture." Exhibit A at ¶ 13.

Concerning Request No. 12 in particular, Movielink does not have any proprietary protocol. The primary protocol used by Movielink systems is the well-known http protocol, and information about this protocol is available at http://en.wikipedia.org/wiki/HTTP and from other public sources. In addition, Movielink's back-end Fulfillment System uses the publicly available SOAP protocol, which is discussed at http://en.wikipedia.org/wiki/SOAP, among other places. Mr. Anderson has confirmed that, other than the documents already produced, he is not aware of any additional responsive documents for this request (while acknowledging the possibility that others could be located as part of the electronic document searching that is currently underway, including specific term searches by prior agreement of the parties). *Id.* at ¶ 12.

4

**2.    Request for Pleadings from Prior Litigation.**

Request for Production No. 43 relating to "all pleadings" in the USA Video litigation, was the subject of numerous calls and letters between the parties. On February 12, for example, Movielink proposed that APDC narrow the request to specific, potentially relevant pleadings and obtain written permission from USA Video to allow Movielink to produce the documents filed under seal, as such documents might contain confidential information not only of Movielink, but also of USA Video. *See* Plaintiff's Brief, Exhibit I. In a February 15 letter, APDC narrowed its request to 37 pleadings from the publicly-available docket sheet. *See* Plaintiff's Brief, Exhibit C. APDC's counsel wrote to USA Video seeking the permission on March 4 and March 10. *See* Plaintiff's Brief, Exhibits J & K. APDC never objected to this procedure or gave Movielink any warning that it would include No. 43 in a motion to compel. Movielink does not object to an Order compelling production of these pleadings, particularly since USA Video has been put on notice.

**C.    Movielink's Production in the *USA Video* Litigation.**

APDC's Motion as to Request Nos. 7, 12, and 13 purports to focus on "basic information" such as "technical manuals and other similar documents reflecting the nature of the Systems." *See, e.g.*, Motion at 6. Yet this information has already been produced, as discussed above. Instead, it is apparent that the Motion is really about APDC's demand for Movielink to search for and produce "all available technical information regarding its systems." *See* Exhibit C hereto (April 2, 2008 email correspondence between the parties.) While this demand is overly broad, unreasonable, and inconsistent with the parties' previous discussions about discovery, Movielink has addressed the demand by offering to make its entire production from the *USA Video* litigation available for APDC's outside counsel to inspect. *Id.*

In its Motion, APDC asserts that "Movielink produced comprehensive discovery on these very same Systems in [the *USA Video* litigation]" and observes that, "like the patent at issue in this case, the patent in the *USA Video* case ... related to video-on-demand technology." Plaintiff's Brief at 2-3. Thus, even APDC's onerous discovery demands now for "all available technical information" should be satisfied by Movielink's offer to allow APDC to inspect that comprehensive discovery in the previous case.

## CONCLUSION

Movielink has been diligent in its document production in this case and has searched for and produced substantial responsive documents, including the highly confidential source code for the relevant Movielink systems. Contrary to APDC's suggestion, Movielink has not failed to search for or refused to produce technical manuals and the like. Rather, APDC's arguments and unsupported suspicions that more of such documentation must exist are not grounded in reality; nor do they provide any basis for an order compelling discovery. Indeed, the Movielink employee with responsibility for all of Engineering at Movielink since at least 2004 and with the broadest knowledge of Movielink system documentation has confirmed his search for documents responsive to Request Nos. 7, 12, and 13. APDC's efforts to resolve this discovery dispute before filing its Motion were not reasonable.

Nor were APDC's efforts to address Request No. 43 reasonable. Movielink has no objection of its own to producing the requested pleadings but has simply sought to avoid any risk of violating the *USA Video* protective order. Thus, Movielink is not opposed to this portion of APDC's Motion and would have so advised APDC, had it conferred with Movielink on the issue before filing the Motion.

6

Movielink requested that APDC withdraw the motion before Movielink drafted its response, but APDC did not. *See* Exhibit C. For all of these reasons, Movielink respectfully requests that the Court deny the Motion in its entirety, including APDC's request for costs, along with all further relief to which Movielink may be entitled.

OF COUNSEL:

Scott W. Breedlove
Alyson N. Gregory
David J. Tobin
Vinson & Elkins LLP
Trammel Crow Center
2001 Ross Avenue, Suite 3700
Dallas, TX  75201-2975


Jeffrey L. Moyer (#3309)
moyer@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
Wilmington, DE  19899
302-651-7700
*Attorneys for Defendant Movielink, LLC*

Dated:  April 3, 2008

7

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2008, I electronically filed the foregoing with the Clerk

of Court using CM/ECF which will send notification of such filing(s) to the following and which

has also been served as noted:

### BY HAND DELIVERY:

>   Thad J. Bracegirdle
>   Reed Smith LLP
>   1201 Market Street
>   Wilmington, Delaware 19801

I hereby certify that on April 3, 2008, the foregoing document was sent to the following

non-registered participants in the manner indicated:

### BY FEDERAL EXPRESS:

>   Mark W. Wasserman
>   Matthew R. Sheldon
>   Reed Smith LLP
>   3110 Fairview Park Drive
>   Suite 1400
>   Falls Church, Virginia 22042

Jeffrey L. Moyer (#3309)

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN PATENT DEVELOPMENT CORPORATION LLC, | § § § | |
| Plaintiff, | § § | |
| v. | § | Civil Action No. 07-605 JJF |
| MOVIELINK LLC, | § § § | |
| Defendant. | § | |

## DECLARATION OF BRUCE ANDERSON

| | |
|---|---|
| STATE OF CALIFORNIA | § |
| | § |
| COUNTY OF LOS ANGELES | § |

I, Bruce Anderson, declare under penalty of perjury that the following is true and correct:

1.     My name is Bruce Anderson. I am over eighteen years of age and have never been convicted of a felony. I have personal knowledge of the facts recited herein and declare such facts are true and correct to the best of my information and belief.

2.     I am the Senior Vice President of Engineering & Operations for Movielink, LLC ("Movielink"). I have been employed at Movielink since April 2002 and have had responsibility for Web Engineering since December 2003 and all of Engineering since November 2004.

3.     In my positions at Movielink, I have acquired knowledge and information relating to Movielink's history and corporate structure. My position and involvement in this case have also provided me with an understanding of Movielink's search for and production of responsive documents.

4.     Movielink was originally formed in 2001 by a joint venture of Paramount Pictures, Sony Pictures, MGM, Universal Studios, and Warner Bros. Studios ("Movielink's Initial Investors").

5.     In November 2002, Movielink launched and began the public use of its movie download system, which I understand is accused of infringement in this case. It was publicized from the outset that the viewing period for downloaded movies would be limited. I understand this functionality is the basis for APDC's complaint in this case. During the first year the Movielink movie download service was in operation, tens of thousands of consumers with access to the internet downloaded over 100,000 movies using the Movielink system.

6.     At its peak in February 2006, Movielink employed approximately 100 employees, including 3 in-house legal staff. More than 60% of the Movielink headcount was in the Technology group.

7.     No later than June 1, 2006, Movielink's Initial Investors revealed that Movielink was for sale. This was public knowledge reported in BusinessWeek, for example.

8.     Blockbuster acquired Movielink effective August 8, 2007.

9.     On October 2, 2007, American Patent Development Corporation LLC ("APDC") filed this lawsuit against Movielink in the United States District Court for the District of Delaware.

10.     Today, Movielink's workforce has significantly decreased to only 37 employees and contractors, with no in-house legal staff. Less than half of the present headcount is in Technology, just over 25% of the Technology headcount at the February 2006 peak.

11.     As a company, Movielink has not had the opportunity to document its systems in the form of technical manuals or the like. I believe I have broader knowledge about Movielink's

DECLARATION OF BRUCE ANDERSON – PAGE 2 OF 4

documentation of its systems than any other individual still remaining at Movielink, and I have made numerous efforts as part of this case to search for and provide documentation of our systems, particularly the types of documents that APDC's counsel has requested. I have provided to Movielink's litigation counsel, and my understanding is that they have produced to APDC's lawyers, all documents I have thus far been able to locate that are responsive to Document Request Nos. 7, 12 and 13. Substantial detail about Movielink's systems is described in Movielink's own patents, especially U.S. Patent No. 7,155,415 (related to Movielink's licensing system) and No. 7,024,466 (related to Movielink's systems for downloading content), as well as the court's order in *USA Video Technology Corporation v. Movielink LLC*, 354 F. Supp.2d 507 (D. Del. 2005), especially at pages 516 to 518. I understand these documents were produced to APDC's lawyers in January of this year. Movielink has even produced its source code, which I understand occurred on March 13 of this year.

12.   Regarding Document Request No. 12, Movielink does not have any proprietary protocol. The primary protocol used by Movielink systems is the well-known http protocol, and information about this protocol is available at http://en.wikipedia.org/wiki/HTTP and from other public sources. In addition, Movielink's back-end Fulfillment System uses the publicly available SOAP protocol, which is discussed at http://en.wikipedia.org/wiki/SOAP, among other places. Other than the documents that I have already provided to counsel, I am not aware of any additional responsive documents for this request, though it is certainly possible that others could be located as part of the electronic document searching that is currently underway.

13.   Movielink does not have substantial documentation of its systems nor a central repository for high-level documents about system architecture. While Movielink is maintaining operations with a significantly downsized work force, I am personally overseeing our search for

DECLARATION OF BRUCE ANDERSON – PAGE 3 OF 4

electronic documents and will provide relevant documents to counsel if any additional documents are located. Among other electronic searching, we are currently conducting searches for responsive documents based on a list of search terms provided by APDC's counsel.

Executed on:   April 4, 2008

Bruce Anderson

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN PATENT DEVELOPMENT CORPORATION LLC, | §<br>§<br>§ | |
| Plaintiff, | §<br>§ | |
| v. | §<br>§ | Civil Action No. 07-605 JJF |
| MOVIELINK LLC, | §<br>§ | |
| Defendant. | §<br>§ | |

## MOVIELINK, LLC'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Defendant Movielink, LLC ("Movielink" or "Defendant"), pursuant to Federal Rules of Civil Procedure 33 and 26(e), hereby supplements its responses to Plaintiff American Patent Development Corporation LLC's ("APDC" or "Plaintiff") First Set of Interrogatories as follows:

## PRELIMINARY STATEMENT

Because discovery in this matter is ongoing, Movielink has not yet concluded its investigation and discovery in this case, but has conducted a diligent and good faith search for responsive information. Accordingly, these supplemental responses to Plaintiff's interrogatories are (1) based upon information currently known to Movielink; (2) set forth without prejudice to its right to assert additional responses or objections should Movielink discover additional documents, information, or grounds for further responses or objections; and (3) made subject to the general objections and specific objections made to the respective interrogatories in Movielink, LLC's Responses and Objections to Plaintiff's First Set of Interrogatories (collectively, the "Objections"). Movielink reserves the right to rely on any facts, documents, or other evidence and to supplement these responses accordingly.

**SUPPLEMENTAL RESPONSES**

**INTERROGATORY NO. 9:**

Identify and describe in detail all facts relating to Movielink's defense in paragraph 12 of its answer that one or more of the claims of the '402 patent are invalid for failure to meet one or more of the provisions of the United States patent laws, 35 U.S.C. § 101 *et seq.*, including but not limited to 35 U.S.C. §§ 102, 103, and 112.

**SUPPLEMENTAL RESPONSE:** Subject to the Objections, Movielink identifies the following prior art references, which establish invalidity of the claims of the '402 patent under §§ 102 and/or 103 of the Patent Act.

Discussion of Hyatt

Movielink contends that claims 1 and 2 of the '402 patent are anticipated under 35 U.S.C. § 102(b) by U.S. Patent No. 4,358,672 ("Hyatt").[1] As charted in Exhibit A, all limitations of the claims are disclosed, either explicitly or inherently, by Hyatt. In the alternative, claims 1 and 2 are invalid under § 103 as being obvious over Hyatt, and obvious over Hyatt viewed in light of one or more references. As more fully elaborated in Exhibit A, Hyatt explicitly discloses all the limitations in claims 1 and 2 except for, perhaps, "storing said video product at said user site," which is at least inherent in the disclosure. Hyatt discusses broadcast television, and one of ordinary skill in the art at the relevant time would know to store this broadcast television at a user site, such as by using computer hard disks or video cassette recorders ("VCRs"):

> We assumed that VideoLine would be used by all members of the
> household who currently view video entertainment programs . . .,
> and would be used in conjunction with other home video
> entertainment services (e.g. broadcast TV, premium cable, video
> cassette tapes). Our design challenge was to create a user interface
> that could be easily integrated with regular TV and VCR viewing,
> would be usable by all members of the household, and could be
> operated with no training and without manuals or tutorials.

*See* James Source, David Fay, Brian Raila & Robert Virzi, *Designing a Broadband Residential Entertainment Service: A Case Study*, 13TH INT'L SYMPOSIUM: HUMAN FACTORS IN TELECOMMUNICATIONS 141, 142 (Sept. 10–14, 1990); *see also* Morales ("The video program is preferably transmitted in digital format, and thus may be easily stored at the subscriber station . . . ."); *Technology Projections: 2001*, DIRECT MARKETING 55.n2, at 45(4) (June 1992) (Cable companies are currently experimenting with devices which . . . are also able to accommodate

---

[1] This and all other contentions of anticipation assume the scope of the asserted patent claims were found to encompass a Movielink system. Movielink contends none of its systems infringes any asserted claim and reserves the right to supplement or amend these contentions if appropriate based on the Court's claim construction.

program downloading to a home storage device, setting the stage for personal viewing on a time-shift basis.").

In addition, the distinction from the broadcast television disclosed in Hyatt (watching television live) to storing a video product (watching video product when the customer chooses) would have been trivial to one of skill in the art. "Broadcast TV could be thought of as simply another 10–100 channels added to the thousands of channels provided from the copier memory system [in a video-on-demand system]. This addition would have a negligible impact on the total system cost." W.D. Sincoskie, *Video on Demand: Is it Feasible?* GLOBECOM '90: IEEE GLOBAL TELECOMMUNICATIONS CONFERENCE & EXHIBITION 201, 204 (1990).

Discussion of Morales

Movielink contends that claims 1 and 2, *inter alia*, of the '402 patent are anticipated under 35 U.S.C. § 102(b) by U.S. Patent No. 5,291,554 ("Morales") because every element in claims 1 and 2 are disclosed, either explicitly or inherently, as set forth in the claim chart attached as Exhibit A. With regards to the claim 2 limitation of "comparing an output of a local clock signal generator with said result of said decoding step," Morales discloses interactively entering a preferred date and time. Morales, at 6:68–7:2. It is inherent to have a local clock signal generator in order to interactively enter said preferred date and time. Furthermore, Morales discloses the use of VCRs, and VCRs have a built-in local clock signal generator. In the alternative, claim 2 is invalid under §103 as obvious over Morales in view of Hyatt, since Hyatt explicitly discloses a local clock signal generator. *See* Hyatt, at 2:53–57, 6:38–41.

Discussion of Latamore

Movielink contends that claim 1 of the '402 patent is anticipated under 35 U.S.C. § 102(b) by the Latamore article. G. Berton Latamore, *Interactive TV Opens New Retail Market*, HIGH TECHNOLOGY, vol. 7, no. 8, at 52 (August 1987) ([hereinafter "Latamore"]. In the alternative, claim 1 is invalid under § 103 as being obvious over Latamore, and obvious over Latamore viewed in light of one or more references (including Morales and Hyatt). In addition, claim 2 of the '402 patent is invalid under § 103 as being obvious over Latamore viewed in light of one or more references (including Morales and Hyatt).

As more fully elaborated in Exhibit A, Latamore explicitly discloses all the limitations in claim 1 except for, perhaps, "storing said video product at said user site" and "storing a result of said decoding step," which are at least inherently disclosed. In the inset article, Latamore discusses a personal computer, in which a storage device is inherent. Latamore also discusses interactive television, and one of ordinary skill in the art would know to store such television data at a user site, such as through computer hard disks or video cassette recorders ("VCRs"):

> We assumed that VideoLine would be used by all members of the
> household who currently view video entertainment programs . . .,
> and would be used in conjunction with other home video
> entertainment services (e.g. broadcast TV, premium cable, video
> cassette tapes). Our design challenge was to create a user interface

3

> that could be easily integrated with regular TV and VCR viewing,
> would be usable by all members of the household, and could be
> operated with no training and without manuals or tutorials.

*See* James Source, David Fay, Brian Raila & Robert Virzi, *Designing a Broadband Residential Entertainment Service: A Case Study*, 13TH INT'L SYMPOSIUM: HUMAN FACTORS IN TELECOMMUNICATIONS 141, 142 (Sept. 10–14, 1990); *see also* Morales ("The video program is preferably transmitted in digital format, and thus may be easily stored at the subscriber station . . . ."); *Technology Projections: 2001*, DIRECT MARKETING 55.n2, at 45(4) (June 1992) (Cable companies are currently experimenting with devices which . . . are also able to accommodate program downloading to a home storage device, setting the stage for personal viewing on a time-shift basis.").

Section 112

In addition, and depending on how APDC seeks to construe the claim terms of its patent, the claim terms "*transmitting from said central station to said user site a digital data stream comprising said video product, and data establishing a limit for authorized viewing of said video product*" (claim 1) and "*transmitting from said central station to said user site a digital data stream comprising said video product, data establishing a time period during which viewing of said video product is authorized*" (claim 2) are indefinite, rendering the asserted claims of the '402 patent invalid. A person of skill in the art at the relevant time would not have been able to ascertain any construction of these terms that would allow the claims to include within their scope any Movielink system, particularly in view of the claim amendments and statements made by the patent applicant to distinguish prior art in the August 5, 1994 Amendment submitted by the applicant to the United States Patent and Trademark Office.

Movielink reserves the right to further supplement this response as its investigation continues and if appropriate following claim construction.

**INTERROGATORY NO. 10:**

Identify and describe in detail all facts relating to Movielink's defense in paragraph 13 of its answer that Movielink does not and has not infringed any valid or enforceable claim of the '402 patent, either literally or under the doctrine of equivalents, either directly, indirectly, contributorily, or by inducement.

**SUPPLEMENTAL RESPONSE:** Subject to the Objections, Movielink observes that APDC has the burden to establish infringement and has asserted two claims of the '402 patent, but has failed to explain how any system or method made, used, offered for sale, or sold by Movielink meets at least the following limitations of the asserted claims, whether literally or by the doctrine of equivalents to the extent, if any, it applies:

Claim 1: "*transmitting from said central station to said user site a digital data stream comprising said video product, and data establishing a limit for authorized viewing of said video product*" – Movielink has never performed such a step. As APDC's infringement contentions implicitly acknowledge, no Movielink station or server ever generates or transmits a data stream

4

that includes both "an encoded movie or other audiovisual work" and a "usage rule [that] sets a limit on the amount of time the video product can be viewed."

Claim 2: "*transmitting from said central station to said user site a digital data stream comprising said video product, data establishing a time period during which viewing of said video product is authorized*" - Movielink has never performed such a step. As APDC's infringement contentions implicitly acknowledge, no Movielink station or server ever generates or transmits a data stream that includes both "an encoded movie or other audiovisual work" and a "usage rule [that] sets a limit on the amount of time the video product can be viewed."

Claims 1 and 2: Nor does Movielink perform any of the remaining steps listed in these method claims. Indeed, the remaining limitations appear to be describing steps performed at the user site by a user's hardware.

Regarding indirect infringement, Movielink has not detailed such a contention as to any claim. Movielink reserves the right to supplement or amend this response depending, for example, on clarification of APDC's theory of infringement or claim scope. Movielink further reserves the right to supplement this response as its investigation continues and if appropriate following claim construction.

## INTERROGATORY NO. 11:

Identify and describe in detail all facts relating to Movielink's defense in paragraph 14 of its answer that the doctrine of prosecution history estoppel precludes a finding of infringement of any valid or enforceable claim of the '402 patent, either literally or under the doctrine of equivalents, either directly, indirectly, contributorily, or by inducement.

**SUPPLEMENTAL RESPONSE:** Subject to the Objections, Movielink observes that APDC has the burden to establish infringement but has not identified any theory of infringement under the doctrine of equivalents. In the event APDC attempts to assert such a theory in the future, Movielink reserves the right to supplement or amend this response, in view of at least the claim amendments and statements made by the patent applicant to distinguish prior art (i.e., for reasons related to patentability) in the August 5, 1994 Amendment submitted by the applicant to the United States Patent and Trademark Office.

## INTERROGATORY NO. 12:

Identify and describe in detail all facts relating to Movielink's defense in paragraph 15 of its answer that American's claims are barred, in whole or in part, by the equitable doctrine of laches.

**SUPPLEMENTAL RESPONSE:** Subject to the Objections, Movielink states that all potentially relevant components of its movie download system have been in public use since Movielink's well-known launch of movie downloads in November 2002. Movielink's public website in that time period noted limits on the time period during which downloaded movies

5

could be viewed. Large numbers of articles from a variety of news sources, including at least USA Today, CBS News, CNET, CedMagazine, and many others reported on the launch, including details about limited viewing and the automatic erasing of movies after the expiration of a certain time period. The public even blogged about the new service. *See, e.g.*, ML01304 – ML1350. A public court decision issued on January 28, 2005 in the *USA Video* litigation gave even more details about Movielink's systems. Yet neither Mr. Garkinkle nor anyone else at APDC ever contacted Movielink to complain or assert the '402 patent.

In the years that followed the public launch, Movielink invested millions of dollars in infrastructure, software, marketing, and advertising, among other things. On its way to *negative* operating and investing cash flows of well over $100 million cumulative, Movielink publicly disclosed that its business was for sale no later than June 1, 2006, as reported in BusinessWeek, for example. During this time, because of Garfinkle's and APDC's silence and inaction and the obvious inapplicability of the '402 patent's claims to Movielink systems, neither Movielink nor its potential purchasers had reason to believe that anyone would assert a theory that the well-known Movielink system somehow infringes the '402 patent. Indeed, this patent was disclosed to the Patent Office during prosecution of Movielink's own patents on its systems, and the Movielink patents were granted without the Examiner raising any objection at all based on the '402 patent. Movielink remained for sale for more than a year before Blockbuster closed on its acquisition of Movielink for approximately $6.6 million. Yet throughout all of this time, neither Garfinkle nor anyone else at APDC ever contacted Movielink to complain or assert the '402 patent.

As a result of Garfinkle's and APDC's silence and laying behind the log, Movielink invested years and many millions of dollars and Blockbuster closed on its acquisition of the Movielink business without the opportunity to consider or address APDC's manufactured infringement allegations.

Garfinkle, the named inventor on the '402 patent and APDC's representative, states on oath that he "has had a longstanding interest in media, media delivery systems, and broadcast television" and that he has for a long time "been involved in businesses relating to media and television networks." Clearly Garfinkle and/or other APDC representatives knew, or at least should have known, of the alleged infringing activities at approximately the time they began in 2002. Garfinkle and/or other APDC representatives also knew, or at least should have known, by approximately June 2006, that the Movielink business was up for sale.

Despite all of this, neither Garfinkle nor any representative of APDC (nor any predecessor) lifted a finger to inform Movielink or Blockbuster of the alleged infringement during all of those years of public use – not even a letter notifying Movielink that APDC had an infringement theory, however far-fetched. Indeed, Garfinkle and APDC delayed until after Movielink invested millions of dollars to expand, maintain, and market its movie download system, after Blockbuster completed its due diligence and acquired the Movielink business, and shortly before the expiration of the six-year period that would give rise to an automatic laches presumption. On information and belief, the delay by Garfinkle and APDC was calculated, deliberate, and in bad faith.

6

The delay by Garfinkle and APDC was egregious and the resulting prejudice to Movielink and Blockbuster has been severe. Laches therefore bars APDC's claims, in whole or in part.

**INTERROGATORY NO. 13:**

Identify and describe in detail all facts relating to Movielink's defense in paragraph 16 of its answer that American's claims are barred, in whole or in part, by the equitable doctrine of estoppel.

**SUPPLEMENTAL RESPONSE:**    Subject to the Objections, Movielink incorporates its response to Interrogatory No. 12, including its supplemental response.   APDC is therefore estopped from asserting its claims against Movielink.

**INTERROGATORY NO. 14:**

Identify and describe in detail all facts relating to paragraphs 8 and 9 of Movielink's counterclaims alleging that the claims of the '402 patent are invalid for failure to meet one or more provisions of the United States patent laws, 35 U.S.C. § 101 *et seq.*, including but not limited to 35 U.S.C. §§ 102, 103, and 112.

**SUPPLEMENTAL RESPONSE:** Subject to the Objections, Movielink incorporates its response to Interrogatory No. 9, including its supplemental response.

**INTERROGATORY NO. 15:**

Identify and describe in detail all facts relating to paragraph 17 of Movielink's counterclaims alleging that Movielink does not and has not infringed any valid or enforceable claim of the '402 patent, either literally or under the doctrine of equivalents, either directly, indirectly, contributorily, or by inducement.

**SUPPLEMENTAL RESPONSE:**    Subject to the Objections, Movielink incorporates its response to Interrogatory No. 10, including its supplemental response.

OF COUNSEL:
Scott W. Breedlove
Alyson N. Gregory
David J. Tobin
Vinson & Elkins LLP
Trammel Crow Center
2001 Ross Avenue, Suite 3700
Dallas, TX 75201-2975
214-220-7700

Dated: February 8, 2008

Jeffrey L. Moyer (#3309)
moyer@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
Wilmington, DE 19899
302-651-7700
*Attorneys for Defendant
Movielink, LLC*

7

**EXHIBIT A**

| CLAIM #1 | HYATT (4,358,672) | MORALES (5,291,554) | Latamore (periodical) |
|---|---|---|---|
| A method for providing a video product from a central station to a user site, comprising the steps of: | U.S. Pat. No. 4,358,672 (the "'672 patent") to Hyatt discloses providing video data, such as movies and sports events, to a user from a central station. '672 patent, at 1:16–37. | U.S. Pat. No. 5,291,554 (the "'554 patent") to Morales discloses a "system for downloading custom ordered movies and the like from a central storehouse facility to one or more subscribers . . . ." '554 patent, at 2:34–37. | An article by Latamore discloses a method of providing a video product from a central station to a user site. G. Berton Latamore, *Interactive TV Opens New Retail Market*, HIGH TECHNOLOGY, vol. 7, no. 8, at 52 (August 1987) ([hereinafter "Latamore"].

In particular, the article discloses "two-way communication between viewers and a central computer . . . ." Latamore, at 52. |
| transmitting from said central station to said user site a digital data stream comprising | The '672 patent discloses subscribers receiving "an enhanced signal carrying television programs . . . ." '672 patent, at 1:16–19.    The '672 patent also provides "[e]xamples of systems which require the transmission of data from the CATV operator to the subscriber's television receiver . . . ." *Id.* at 1:62–64. | The '554 patent discloses a "distribution means for transmitting said video programs over a satellite network between said program center and said subscriber stations . . . ." '554 patent, at 8:48–51. | The article discloses sending a signal to the customer "via microwave transmission, terrestrial lines, satellite, or other existing data-communication network." Latamore, at 52. |
| said video product. | The '672 patent discloses, for example, transmission of community antenna television (CATV) signals. '672 patent, at 1:16–20. | The '554 patent discloses a "video program [that] is preferably transmitted in digital format . . . ." '554 patent, at 3:12–15. | The viewer "downloads video signals to home televisions." Latamore, at 52. |

| CLAIM #1 | HYATT (4,358,672) | MORALES (5,291,554) | Latamore (periodical) |
|---|---|---|---|
| and data establishing a limit for authorized viewing of said video product | The '672 patent discusses a need to "limit viewing" of special programs to paying subscribers . . . . '672 patent, at 1:38–39. One method for limiting viewing is "the transmission of enabling and disabling signals to each subscriber's residence by complex transmitters and receivers and intermediary connecting lines." *Id.* at 1:50–53. Another method is through the use of a "magnetic stripe to actuate a security device for enabling television viewing." *Id.* at 2:18–28. The '672 patent further discloses several modes of limiting authorized viewing, such as "pay per month, pay per view and wild card." *Id.* 7:5–10. In the pay per view operation, the "data encoded on the dual magnetic stripes . . . of the data card . . . can specify one, two, three or four time periods within the month in which the data card is valid." *Id.* at 8:19–22. | The '554 patent discloses special purpose single-shot software. '554 patent, at 3:7–23; 6:8–12 ("one-shot private viewing of an ordered program"); 9:40–47 ("limited private viewing conditions"). The patent also describes the "downloading of a unique deciphering key in response to a completed rental transaction . . . . With the deciphering key 20 removed from the program, and transmitted at a different tune, and encrypted in a different manner in the separate interactive channel communications, the security against piracy is formidable." *Id.* at 5:40–50. | The article discloses that the content provider "will probably charge a yet-to-be announced subscription fee. It is generally presumed that users will be assessed either a sign-up fee, monthly service charge, per-minute usage charge, or a combination of these." Latamore, at 54 (inset article). |
| storing said video product at said user site; | Hyatt discusses broadcast television, and one of ordinary skill in the art at the relevant time would know to store this broadcast television at a user site, such as by using computer hard disks or video cassette recorders ("VCRs"). Alternatively, this limitation is disclosed explicitly in Morales. | The patent specifies that "[t]he video program is preferably transmitted in digital format, and thus may be easily stored at the subscriber station . . . ." '554 patent, at 3:12–14; *see id.* at 8:48–51; 9:24–27. Further reference is made to "automated storage." *Id* at 3:26; 7:22–26; *see also id.* at 6:17–21 (storing the downloaded program "at the subscriber station either in digital, analog, encrypted or decrypted format"). Also disclosed is memory sufficient for downloading the video movies, and examples include a VCR for "interactively recording programs in conventional television format." *Id.* at 4:67–5:4. | Latamore discloses a "computer communications service, requiring users to own a personal computer." Latamore, at 54 (inset article). A storage device, such as a hard drive or tape backup, is inherent to a personal computer. Alternatively, this limitation is disclosed explicitly in Morales. |

| CLAIM #1 | HYATT (4,358,672) | MORALES (5,291,554) | Latamore (periodical) |
|---|---|---|---|
| Decoding said data establishing a limit for authorized viewing of said video product; | The '672 patent discloses that the limiting data is decoded. '672 patent, at 6:28–37 (reading data on the card by a processor circuit which includes a CRB decoder); 10:37–40 ("said processor includes a CRB decoder"); 6:53–54 (time display module decodes incoming data from clock). | In conventional systems, a viewer is given access "generally in the form of a deciphering key to a scrambled transmission." '554 patent, at 1:18–19. The key "represents encryption of the video programs broadcast in one direction . . . from the program processing center . . . to a selected subscriber station . . . ." *Id.* at 4:23–27; *see also id.* at 6:22–25 (storing encrypted program "to be descrambled with key 20 under control of software section 52 at the viewers convenience"). | "The decoder will convert the signal for television and pipe it into the user's home." Latamore, at 52. |
| storing a result of said decoding step; | The '672 patent discloses erasing the data encoded on the magnetic stripes after the data is read and stored. 3:3–5. The data is read by a reader and stored in a processor. '672 patent at Abstract, 12:5–12. | The downloaded program is stored at the subscriber station either in digital, analog, encrypted or decrypted format, and the program is descrambled at the viewers' convenience. '554 patent, at 6:17–25. Furthermore, local software provides for processing the decryption while the program is being viewed. *Id.* at 7:28–30. | Latamore discloses a "computer communications service, requiring users to own a personal computer." Latamore, at 54 (inset article). A storage device, such as a hard drive or tape backup, is inherent to a personal computer. Alternatively, this limitation is explicitly disclosed in Morales. |

3

RLF1-3251979-1

| CLAIM #1 | HYATT (4,358,672) | MORALES (5,291,554) | Latamore (periodical) |
|---|---|---|---|
| Blocking access to said video product stored at said user site if said limit for authorized viewing is exceeded. | The '672 patent teaches "a comparator for comparing the data stored in said reader with said clock output signal, and a security control device operable in at least two states, one of said states permitting access to said service and the other of said states preventing access to said service, said security device being responsive to said comparator for permitting and preventing access to said service as a function of the data encoded on said record medium." '672 patent, at 10:28-36; see also id. at 2:57-63 (further describing the security device); 8:26-38 (further describing the comparator in pay-per-view operation). | "To assure a single viewing, the one-shot software of section 52 is downloaded from the interactive data control center. This software is programmed to self destruct and erase after one viewing. Although a software expert might divert and pirate a single program by writing special software for the subscriber home unit computer, the time taken and cost for decrypting would be so high compared to the cost of rentals that there would be little motivation. Furthermore, the software from the data center can be changed frequently, and the random number key 30 is unique to a single program, so that in effect there is a maximized security in this system against piracy. If permitted by the prepayment of a recording license fee, for example, the software can also activate via control section 53 the VCR 21 for recording the program in decrypted analog format as indicated at AND circuit 54." '554 patent, at 6:25-42; see also id. at 3:20-23 (wherein "the software self destructs after the single-viewing"). | The article discloses that users will be charged "a yet-to-be-announced subscription fee." Latamore, at 54 (inset article). This suggests that access to the video product must be blocked, or else no one would need to pay the fee. |

| CLAIM #2 | HYATT (4,358,672) | MORALES (5,291,554) |
|---|---|---|
| A method for providing a video product from a central station to a user site, comprising the steps of: | U.S. Pat. No. 4,358,672 (the "'672 patent") to Hyatt discloses providing video data, such as movies and sports events, to a user from a central station. '672 patent, at 1:16-37. | U.S. Pat. No. 5,291,554 (the "'554 patent") to Morales discloses a "system for downloading custom ordered movies and the like from a central storehouse facility to one or more subscribers . . ." '554 patent, at 2:34-37. |
| transmitting from said central station to said user site a digital data stream comprising | The '672 patent discloses subscribers receiving "an enhanced signal carrying television programs . . ." '672 patent, at 1:16-19. The '672 patent also provides "[e]xamples of systems which require the transmission of data from the CATV operator to the subscriber's television receiver . . ." Id. at 1:62-64. | The '554 patent discloses a "distribution means for transmitting said video programs over a satellite network between said program center and said subscriber stations . . ." '554 patent, at 8:48-51. |

4

RLF1-3251979-1

| CLAIM #2 | HYATT (4,358,672) | MORALES (5,291,554) |
|---|---|---|
| said video product; | The '672 patent discloses, for example, transmission of community antenna television (CATV) signals. '672 patent, at 1:16–20. | The '554 patent discloses a "video program [that] is preferably transmitted in digital format . . . ." '554 patent, at 3:12–15. |
| data establishing a time period during which viewing of said video product is authorized; | The '672 patent discusses a need to "limit viewing of special programs to paying subscribers . . . ." '672 patent, at 1:38–39. One method for limiting viewing is "the transmission of enabling and disabling signals to each subscriber's residence by complex transmitters and receivers and intermediary connecting lines." *Id.* at 1:50–53. Another method is through the use of a "magnetic stripe to actuate a security device for enabling television viewing." *Id.* at 2:18–28.

The '672 patent further discloses several modes of limiting authorized viewing, such as "pay per month, pay per view and wild card." *Id.* 7:5–10. The '672 patent discusses the pay-per-month operation at 7:9–8:16. The patent also discloses a "record medium adapted to have encoded thereon data indicative of a definite time period during which access to said service is to be permitted. *Id.* at 10:14–16. | The '554 patent discloses special purpose single-shot software. '554 patent, at 3:7–23; 6:8–12 ("one-shot private viewing of an ordered program"); 9:40–47 ("limited private viewing conditions"). The patent also describes the "downloading of a unique deciphering key in response to a completed rental transaction. . . . With the deciphering key 20 removed from the program, and transmitted at a different time, and encrypted in a different manner in the separate interactive channel communications, the security against piracy is formidable." *Id.* at 5:40–50.

"The advantage of a solo order is that a preferred date and time viewing becomes more feasible, in essence depending only upon the distribution of traffic on the satellite channels operated by the program vendor. Note that the preferred date and time may be interactively entered." '554 patent, at 6:68–7:2. |
| storing said video product at said user site; | Hyatt discusses broadcast television, and one of ordinary skill in the art at the relevant time would know to store this broadcast television at a user site, such as by using computer hard disks or video cassette recorders ("VCRs"). Alternatively, this limitation is disclosed explicitly in Morales. | The patent specifies that "[t]he video program is preferably transmitted in digital format, and thus may be easily stored at the subscriber station . . . ." '554 patent, at 3:12–14; *see id.* at 8:48–51; 9:24–27. Further reference is made to "automated storage." *Id.* at 3:26; 7:22–26; *see also id.* at 6:17–21 (storing the downloaded program "at the subscriber station either in digital, analog, encrypted or decrypted format").

Also disclosed is memory sufficient for downloading the video movies, and examples include a VCR for "interactively recording programs in conventional television format." *Id.* at 4:67–5:4. |

5

| CLAIM #2 | HYATT (4,358,672) | MORALES (5,291,554) |
|---|---|---|
| Decoding said data establishing a time period during which viewing of said video product is authorized; | The '672 patent discloses that the limiting data is decoded. '672 patent, at 6:28–37 (reading data on the card by a processor circuit which includes a CRB decoder); 10:37–40 ("said processor includes a CRB decoder"); 6:53–54 (time display module decodes incoming data from clock). | In conventional systems, a viewer is given access "generally in the form of a deciphering key to a scrambled transmission." '554 patent, at 1:18–19. The key "represents encryption of the video programs broadcast in one direction . . . from the program processing center . . . to a selected subscriber station . . ." Id. at 4:23–27; see also id. at 6:22–25 (storing encrypted program "to be descrambled with key 20 under control of software section 52 at the viewers convenience"). |
| storing a result of said decoding step; | The '672 patent discloses erasing the data encoded on the magnetic stripes after the data is read and stored. '672 patent, at 3:3–5. The data is read by a reader and stored in a processor. Id. at Abstract, 12:5–12. | The downloaded program is stored at the subscriber station either in digital, analog, encrypted or decrypted format, and the program is descrambled at the viewer's convenience. '554 patent, at 6:17–25. Furthermore, local software provides for processing the decryption while the program is being viewed. Id. at 7:28–30. |
| comparing an output of a local clock signal generator with said result of said decoding step; pl | The '672 patent discloses a "clock circuit having an output signal indicative of instantaneous time, including date, hour, minute and second, and a comparator for comparing the data stored in the reader with the clock output signal . . ." '672 patent, at 2:53–57. Also, the "[c]lock data developed in the processor . . . is applied to the input of a time display module . . . which includes the decoding and driving circuitry for a digital time display . . . ." Id. at 6:38–41. | "The advantage of a solo order is that a preferred date and time viewing becomes more feasible, in essence depending only upon the distribution of traffic on the satellite channels operated by the program vendor. Note that the preferred date and time may be interactively entered." '554 patent, at 6:68–7:2. It is inherent to have a local clock signal generator in order to interactively enter said preferred date and time. Furthermore, Morales discloses the use of VCRs, and VCRs have a built-in local clock signal generator. Alternatively, this limitation is disclosed explicitly in Hyatt. |

6

| CLAIM #2 | HYATT (4,358,672) | MORALES (5,291,554) |
|---|---|---|
| erasing said video product stored at said user site if the result of said comparing step is that the time period during which viewing of said video product is authorized has expired. | Data encoded on the magnetic stripes is erased after the data is read and stored. '672 patent, at 3:3–7, 5:40–44.<br><br>"As the internal clock 47 within the processor circuit 46 provides output data indicative of current day and time, this information is compared by the comparator 53 with the data read from the monthly viewing card and additional data read from the pay per view card to determine whether or not an enable signal is to be provided on a specified channel at the current time." *Id.* at 8:59–65.<br><br>The '672 patent teaches "a comparator for comparing the data stored in said reader with said clock output signal, and a security control device operable in at least two states, one of said states permitting access to said service and the other of said states preventing access to said service, said security device being responsive to said comparator for permitting and preventing access to said service as a function of the data encoded on said record medium." '672 patent, at 10:28–36; *see also id.* at 2:57–63 (further describing the security device). | "To assure a single viewing, the one-shot software of section 52 is downloaded from the interactive data control center. This software is programmed to self destruct and erase after one viewing. Although a software expert might divert and pirate a single program by writing special software for the subscriber home unit computer, the time taken and cost for decrypting would be so high compared to the cost of rentals that there would be little motivation. Furthermore, the software from the data center can be changed frequently, and the random number key 30 is unique to a single program, so that in effect there is a maximized security in this system against piracy. If permitted by the prepayment of a recording license fee, for example, the software can also activate via control section 53 the VCR 21 for recording the program in decrypted analog format as indicated at AND circuit 54." '554 patent, at 6:25–42; *see also id.* at 3:20–23 (wherein "the software self destructs after the single-viewing"). |

7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN PATENT DEVELOPMENT | § | |
| CORPORATION LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 07-605 JJF |
| | § | |
| MOVIELINK LLC, | § | |
| | § | |
| Defendant. | § | |

## VERIFICATION FOR MOVIELINK, LLC'S RESPONSES AND
## OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

I am competent to make this verification. I am employed by Defendant Movielink LLC as Senior Vice President, Engineering and Operations, and am authorized to make this verification on its behalf.

I have read Movielink LLC's Responses and Objections to Plaintiff's First Set of Interrogatories and Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories, and declare under penalty of perjury that the answers that recite factual information are true and correct to the best of my knowledge, information, and belief.

Executed this ___ day of February, 2008

Bruce Anderson

-1-

## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2008 true and correct copies of the foregoing document were caused to be served on counsel of record at the following addresses as indicated:

### BY HAND DELIVERY:

Thad J. Bracegirdle
Reed Smith LLP
1201 Market Street
Wilmington, Delaware 19801

### BY FEDERAL EXPRESS:

Mark W. Wasserman
Matthew R. Sheldon
Reed Smith LLP
3110 Fairview Park Drive
Suite 1400
Falls Church, Virginia 22042

Jeffrey L. Moyer (#3309)

RLF1-3238039-1

# EXHIBIT C

## Breedlove, Scott

| | |
|---|---|
| **From:** | Breedlove, Scott |
| **Sent:** | Wednesday, April 02, 2008 5:18 PM |
| **To:** | 'Wasserman, Mark W.' |
| **Cc:** | Sheldon, Matthew R.; Moyer, Jeffrey; Jackson, Andy |

**Subject:** RE: APDC/Movielink

Mark:

In light of your position, we will prepare and file our response to APDC's motion. I want to be clear that we have requested you withdraw the motion or, at a minimum, carry it for a month, and you are refusing.

In our view, your motion was improperly filed and did not properly account for the Court's conference requirement. Indeed, of the four issues raised in your motion, your motion notes as to three of them that Movielink has agreed to produce responsive documents, but the motion contends that we have not. I have told you repeatedly that Movielink has searched for and produced, and is continuing to do so, responsive documents related to the architecture of the relevant Movielink systems. I advised you yesterday afternoon that we have located two more such documents (related to the license delivery system), and we are producing those this week; yet you have tried to use that against us in your latest correspondence. You argue that the documentation "should have" been produced some time ago, but we simply could not produce documents that had not yet been located. As I have told you several times, Movielink is operating with a fraction of its previous workforce, and those with knowledge of its documentation are working with more than reasonable diligence on this in light of the circumstances. The parties' discussions on these points simply should not require APDC to demand the Court's intervention, particularly not at this juncture.

In any event, with the documents we have produced -- including the Movielink patents that describe relevant systems in substantial detail, the District of Delaware's decision in the *USA Video* litigation, the Multi-CDN design documentation, the relevant Movielink source code itself, and the technical expert reports from the *USA Video* litigation -- and particularly with the license delivery documents we are producing this week, APDC's argument in the motion that Movielink has not produced the requested "basic information" is not credible.

As to the fourth issue raised in your motion, Movielink has agreed to produce the pleadings at issue, assuming USA Video does not object. I understood you agreed to request permission from USA Video, and in fact you copied me on your correspondence to USA Video requesting permission. Without warning, and without conferring with me or any other Movielink counsel, however, APDC then filed the motion to compel. If your issue is with Movielink concerning these documents, I must stress that APDC counsel's efforts to reach agreement on this matter were not reasonable.

From your email today, it sounds as though what you are really looking for, despite what you have told me previously, is "all available technical information regarding [Movielink's] systems," and you will not be satisfied until you get that. This is an overly broad demand on its face. In any event, we have been

tracking down Movielink's production in the *USA Video* litigation and have located it in the custody of a Sidley office in California. In order to foreclose this and future disputes raised by APDC (including whatever alleged "other deficiencies" your email is referencing), Movielink is willing to allow outside counsel for APDC to review the entire production and tag desired documents for copying, subject to standard terms related to privilege issues and copying costs.

In light of all of the above, please let me know if APDC will reconsider and will withdraw the motion, or at a minimum carry the motion for a month.

Regards,
Scott

**Scott W. Breedlove**
Vinson & Elkins LLP
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, TX 75201-2975
Tel 214.220.7993
Fax 214.999.7993
sbreedlove@velaw.com

---

**From:** Kehoe, Katherine R. [mailto:KKehoe@ReedSmith.com] **On Behalf Of** Wasserman, Mark W.
**Sent:** Wednesday, April 02, 2008 11:39 AM
**To:** Breedlove, Scott
**Cc:** Sheldon, Matthew R.
**Subject:** APDC/Movielink

Scott:

I know you called this morning when I was unavailable. Unfortunately, something is wrong with our telephone system and I cannot presently make any outgoing calls. I will try again this afternoon.

In the meantime, and as we discussed yesterday, I find it very hard to believe that Movielink has produced all available technical information regarding its systems. Indeed, you indicated yesterday that you have found something that relates to the "license" or "license tokens" that are a part of Movielink's systems. You said this information would be produced in response to our second set of document requests which specifically requested such information (No. 47). As I said yesterday, the second set of document requests, which did include a specific request related to Movielink's "licenses" and "license tokens," was broad enough to include Movielink's license technology. Therefore, in my view, whatever you found recently should have been produced some time ago in response to the first set of document requests.

In any case, Movielink should prepare its response to the pending motion to compel. I am, of course, willing to discuss this further with you.

There are also numerous other deficiencies in Movielink's production that must be resolved.

Mark

**Mark W. Wasserman**
703-641-4229

4/3/2008

mwasserman@reedsmith.com

**Reed Smith** LLP
3110 Fairview Park Drive
Suite 1400
Falls Church, Virginia  22042
703-641-4200
Fax 703-641-4340

\* \* \*

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

\* \* \*

To ensure compliance with Treasury Department regulations, we inform you that, unless otherwise indicated in writing, any U.S. Federal tax advice contained in this communication  (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or applicable state and local provisions or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.
Disclaimer Version RS.US.1.01.03
pdc1