```
                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF DELAWARE


AMERICAN PATENT DEVELOPMENT,   :
CORPORATION, LLC,              :
                               :
          Plaintiff,           :
                               :
    v.                         :   Civil Action No. 07-605-JJF
                               :
MOVIELINK, LLC,                :
                               :
          Defendant.           :
                               :
```

Mark W. Wasserman, Esquire and Matthew R. Sheldon, Esquire of
REED SMITH LLP, Falls Church, Virginia.
Thad J. Bracegirdle, Esquire of REED SMITH LLP, Wilmington,
Delaware.

Attorneys for Plaintiffs American Patent Development Corporation,
LLC.

Scott W. Breedlove, Esquire; David Tobin, Esquire and Andrew
Jackson, Esquire of VINSON & ELKINS LLP, Dallas, Texas.
Jeffrey L. Moyer, Esquire of Richards, Layton & Finger, PA,
Wilmington, Delaware.

Attorneys for Defendants Movielink, LLC.

_____

**MEMORANDUM OPINION**

March 27, 2009
Wilmington, Delaware

Farnan  District Judge

This is a patent infringement case brought by American
Patent Development Corporation, LLC against Movielink, LLC,
alleging infringement of United States Patent No. 5,400,402 ("the
'402 patent"), which pertains to systems for controlling the use
of video-on-demand programming.  (See, e.g., '402 patent at 1:13-
20.)  The parties briefed their respective positions on claim
construction, and the Court conducted a Markman hearing on the
disputed terms.  This Memorandum Opinion provides constructions
of the disputed terms.

Also pending before the Court is Defendant's Motion To
Strike The Declaration Of Professor Martha McPhee.  (D.I. 72.)
Plaintiff submitted Professor McPhee's declaration in support of
its claim construction positions.  This Memorandum Opinion
further provides a decision on Defendant's Motion To Strike.

**BACKGROUND**

The '402 patent relates to a simple, inexpensive system for
limiting the use of a downloaded video program purchased by a
customer.  In this scheme, a "central station" transmits a "video
product" to a customer at a "user site."  The claims are directed
to control systems for limiting the customer's access to the
video programming after certain viewing limits have been reached.
(See '402 patent at 2:14-37.)  Specifically, the "central
station" transmits not just a "video product," but also data that
sets limits on the extent to which the customer may view the

"video product." For instance, the customer may be allowed to
view the "video product" only for a limited duration or,
alternatively, the customer may be allowed to access the "video
product" only a certain number of times. (See '402 patent at
2:27-37.) Thus, the asserted claims include steps directed to
"decoding" the data establishing viewing limits, "storing" this
limiting data, and then subsequently either blocking access to or
erasing the "video product" if it is determined that the viewing
limits are exceeded.

## DISCUSSION

## I. The Legal Principles of Claim Construction

Claim construction is a question of law. Markman v.
Westview Instruments, Inc., 52 F.3d 967, 977-78 (Fed. Cir. 1995).
When construing the claims of a patent, a court considers the
literal language of the claim, the patent specification and the
prosecution history. Markman, 52 F.3d at 979. Of these sources,
the specification is "always highly relevant to the claim
construction analysis. Usually it is dispositive; it is the
single best guide to the meaning of a disputed term." Phillips
v. AWH Corporation, 415 F.3d 1303, 1312-17 (Fed. Cir.
2005)(quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d
1576, 1582 (Fed. Cir. 1996)). However, "[e]ven when the
specification describes only a single embodiment, the claims of
the patent will not be read restrictively unless the patentee has

2

demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed. Cir. 2004)(quoting Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1327 (Fed. Cir. 2002)).

A court may consider extrinsic evidence, including expert and inventor testimony, dictionaries, and learned treatises, in order to assist it in understanding the underlying technology, the meaning of terms to one skilled in the art and how the invention works. Phillips, 415 F.3d at 1318-19; Markman, 52 F.3d at 979-80. However, extrinsic evidence is considered less reliable and less useful in claim construction than the patent and its prosecution history. Phillips, 415 F.3d at 1318-19 (discussing "flaws" inherent in extrinsic evidence and noting that extrinsic evidence "is unlikely to result in a reliable interpretation of a patent claim scope unless considered in the context of intrinsic evidence").

In addition to these fundamental claim construction principles, a court should also interpret the language in a claim by applying the ordinary and accustomed meaning of the words in the claim. Envirotech Corp. v. Al George, Inc., 730 F.2d 753, 759 (Fed. Cir. 1984). If the patent inventor clearly supplies a different meaning, however, then the claim should be interpreted according to the meaning supplied by the inventor. Markman, 52

3

F.3d at 980 (noting that patentee is free to be his own lexicographer, but emphasizing that any special definitions given to words must be clearly set forth in patent). If possible, claims should be construed to uphold validity. In re Yamamoto, 740 F.2d 1569, 1571 (Fed. Cir. 1984).

## II. Defendant's Motion To Strike The Declaration of Professor Martha McPhee

Along with its responsive claim construction brief, Plaintiff submitted the declaration of English Professor Martha McPhee, who opined on the proper function of a comma that appears in one of the asserted claims. (D.I. 75 at 2; see also D.I. 67, Exh. 3 (McPhee Decl.).) Defendant moved to strike the McPhee declaration, contending that Professor McPhee's opinion is irrelevant for claim construction, that Professor McPhee's opinion contradicts the intrinsic evidence, and that Professor McPhee is not qualified to testify regarding the meaning of the claim terms to persons of ordinary skill in the art. (See D.I. 72 at 1, 4.)

On reviewing the parties' briefing, the Court concludes that Professor McPhee is qualified to testify as to the function of a comma in English grammar and that her methods of analysis were sufficiently reliable for her opinion to be admissible under Rule 702. To the extent Defendant argues that Professor McPhee's opinion contradicts the intrinsic evidence or that Professor McPhee does not have expertise in the specific technical are of

4

the '402 patent, the Court finds that these issues merely impact

the weight that should be given to Professor McPhee's opinion.

Accordingly, the Court will deny Defendant's Motion To Strike

(D.I. 72.)

## III. The Meaning of the Disputed Terms

Claim 1 of the '402 patent states:

1.   A method for providing a video product from a
central station to a user site, comprising the steps
of:
   transmitting from said central station to said user
      site a digital data stream comprising said video
      product, and data establishing a limit for
      authorized viewing of said video product;
   storing said video product at said user site;
   decoding said data establishing a limit for
      authorized viewing of said video product;
   storing a result of said decoding step;
   blocking access to said video product stored at said
      user site if said limit for authorized viewing is
      exceeded.

('402 patent at 4:56-68.)  To a large degree, claim 2 parallels

claim 1.  However, the final limitation of claim 2, rather than

calling for access to be blocked after a viewing "limit" is

exceeded, calls for erasure of the video product if an authorized

time period for viewing of the product has expired.

The parties purport to dispute the meaning of virtually

every phrase in the asserted claims.  However, as explained in

greater detail below, based on the Court's review of the parties'

claim construction briefs and their arguments during the Markman

hearing, the Court discerns only a small number of claim

construction disputes that are of significance. One issue of importance is whether the "central station" must transmit the "video product" and limiting data to the "user site" <u>together</u> as part of a single, continuous "data stream." Pointing to statements in the prosecution history, Defendant contends that Plaintiff has disavowed claims covering separate transmission of the limiting data and "video product." A related dispute concerns whether the "central station" must reside at a "single location." Defendant contends that because the limiting data and "video product" are transmitted together as part of a single, continuous data stream, the "central station" must be at a single location. Were this not so, then the limiting data could perhaps be transmitted from one location and the "video product" from another, which would preclude the two pieces of data from being transmitted together as part of a single, continuous data stream. Plaintiff vigorously objects to the premise that the claims require the limiting data and "video product" to be transmitted together as part of a single data stream. According to Plaintiff, the "central station" need only be "central" in a logical sense, not in a physical or geographic sense.

For the reasons that follow, the Court construes the disputed terms as follows:

A. "A Digital Data Stream Comprising Said Video Product, And Data Establishing A Limit For Authorized Viewing Of Said Video Product"

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Data containing: (i) video data that when received and stored at the user site is a video product, and (ii) one or more data values that set an expiration threshold for either a limited viewing time period or a limited number of views of the video product or a combination thereof. | Data transmitted from the central station to the user site as a single, continuous stream of digital data that includes both the video product and the data establishing a limit for authorized viewing of the video product. |

The dispute between the parties is whether both the "video product" and "data establishing a limit" must be part of the same, continuous "data stream" (Defendant's position) or not (Plaintiff's position).  The parties' dispute over this term dovetails with the parties' dispute over the claim term "central station."  Indeed, if the "central station" is understood to be geographically delocalized, then it is far less plausible to impose a requirement that the video product and limiting data be transmitted together as part of a single, continuous data stream. Put another way, if the "central station" is composed of components that are distinct and geographically separated - yet still connected in a logical sense - then it is far easier to

7

envision the video product and limiting data as being transmitted to the user site separately from one another.

Plaintiff raises two main arguments in support of their construction. First, Plaintiff relies on the fact that the specification, in describing the prior art, incorporates by reference U.S. Patent No. 4,506,387 ("the '387 patent"), which, according to Plaintiffs, shows a "central data station" that includes both a "host computer" and "memory modules" that are each distinct data transmission sources. (D.I. 64 at 6.) By incorporating by reference a patent that discloses a system similar to the system of the patent-in-suit that includes a "central data station" with multiple distinct transmission sources, Plaintiff contends that the '402 patent thus confirms that the "digital data stream" "includes data transmitted from one or more computers." (See D.I. 64 at 11.) Second, Plaintiff places great reliance on the presence of the comma in the disputed claim term. According to Plaintiff, the comma separates the "video product" from the "data establishing a limit" and thus mandates a construction that allows for these pieces of data to be transmitted separately. (See id. at 11-12.)

Though Defendant notes some evidence in the specification supporting its view that the limiting data and video product must be transmitted concomitantly, (see, e.g., '402 patent at 3:34-36), Defendant relies largely on the prosecution history to

support its proposed construction.  Specifically, Defendant
contends that in order to overcome an examiner's rejection and
distinguish the prior art Morales reference, the patentee
explained that his invention, unlike the prior art, transmitted
the video product and limiting instructions together.
Specifically, in an August 1994 Amendment, the patentee explained
as follows:

> Specifically applicant respectfully submits that
> presently pending claims 9, 10, 11 [which ultimately
> issued as claims 1, 2, and 3 of the '402 patent] define
> applicant's invention over the references of record
> either alone or in combination.  Independent claims 9,
> 10 and 11 specifically point out that time limiting
> data is transferred to the user site as part of the
> down-loaded data stream that includes the video
> product.  Neither of the references of record teach or
> suggest down-loading the limiting data as part of the
> video stream.  Hyatt does not teach down-loading such
> data at all.  Morales teaches down-loading a single
> shot program to decode the data but does not teach or
> suggest the use of time limiting data (claims 10 and
> 11) or that limiting data should be down-loaded as part
> of the video data stream.

(D.I. 63, Exh. G at 6 (emphasis added); see also id. at 3-4 ("In
accordance with the applicant's invention, the user's access to
the video product stored at the user site is limited in
accordance with data that is transferred concomitantly as part of
the down-loaded digital data stream.") (emphasis added)).
Notably, the originally submitted claims, which were all
cancelled as part of the amendment, included no limitations
reciting "transmitting" a "digital data stream."  Following the
Amendment, the examiner allowed the claims.

"[I]n order to disavow claim scope during prosecution a patent applicant must clearly and unambiguously express surrender of subject matter." Voda v. Cordis Corp., 536 F.3d 1311, 1321 (Fed. Cir. 2008)(citations omitted). "A patentee could do so, for example, by clearly characterizing the invention in a way to try to overcome rejections based on prior art." Computer Docking Station Corp. v. Dell, Inc., 519 F.3d 1366, 1374 (Fed. Cir. 2008). In the Court's view, in light of the statements made during prosecution, this is what the patentee has done here. Accordingly, the Court will construe this claim term to mean, as Defendant contends, "[d]ata transmitted from the central station to the user site as a single, continuous stream of digital data that includes both the video product and the data establishing a limit for authorized viewing of the video product."

Because of the prosecution history, Plaintiff's argument regarding the presence of the comma is unavailing. Furthermore, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term. Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." Phillips v. AWH Corp., 415 F.3d 1303, 1314 (Fed. Cir. 2005). In this regard, claims 2 and 3 of the '402 patent are instructive. Specifically, in claim 3, it is clear that the

"transmitting" step recites a "data stream" that includes (1) the "video product," (2) "data establishing a time period," and (3) "time of day clock synchronizing data."  The full limitation from claim 3 reads as follows:

> transmitting from said central station to said user site a digital data stream comprising said video product, data establishing a time period during which viewing of said video product is authorized, and time of day clock synchronizing data;

('402 patent at 6:3-7.)  Asserted claim 2 is a slightly modified version of claim 3.  Among other modifications, the "transmitting" step of claim 2 refers only to (1) the "video product" and (2) the "data establishing a time period."  However, claim 2, as written, makes little sense.  Indeed, the "video product" is separated from the "data establishing a time period" by only a comma without the word "and":

> transmitting from said central station to said user site a digital data stream comprising said video product, data establishing a time period during which viewing of said video product is authorized;

(Id. at 5:3-7.)  Plaintiff's expert witness, English professor Martha McPhee, acknowledges that omission of the word "and" was most likely a typographical error, but nevertheless assumes that comma was intentionally retained.  (See D.I. 63, Exh. 3 ¶ 15.)  Making these assumptions, Professor McPhee concludes that the "data stream" including the "video product" is transmitted separately from the "data establishing a limit."  (Id.)  However, in the Court's view, against the backdrop of the unambiguous

11

prosecution history[1] and the usage of "data stream" in claim 3, a far more plausible interpretation is that the "data stream" in claims 1 and 2, like the "data stream" in claim 3, include both the "video product" and the limiting data.

In attempting to refute Defendant's arguments regarding the prosecution history, Plaintiff relies largely on the Federal Circuit's decision in Superguide Corp. v. DirecTV Enters., 358 F.3d 870, 881-82 (Fed. Cir. 2004). In so doing, Plaintiff argues that the key references they distinguished during prosecution did not teach the downloading of limiting data at all. In these circumstances, Plaintiffs, pointing to Superguide, contend that any statements in the prosecution history distinguishing these references on the basis of whether they transmit limiting data with the video product are merely "tangential" and thus not a disclaimer of claim scope. See Superguide, 358 F.3d at 882 ("[T]he '578 patentees were merely distinguishing their invention from one that requires no searching at all by pointing out that their invention provides for searches of coded information stored in memory. They did not clearly disavow the scope of searches covered by claim 1 because Skerlos did not conduct any type of search."); see also D.I. 69 at 22:17-23:6 (Plaintiff argues

---

[1] It appears that Professor McPhee was not given an opportunity to review the prosecution history of the '402 patent when preparing her opinion. (See D.I. 75, Exh. A at 32:14-34:9.)

during the Markman hearing that, based on Superguide, statements in the prosecution history are "tangential").

However, the Court is unpersuaded that Superguide is determinative of the parties' dispute on this claim term. For one thing, in Superguide, the patent holder argued during prosecution that their invention included "a search of all coded information," but the accused infringer's proposed construction interpreted this to mean that the claims required an "examination of all records in memory." Id. at 882. As the Federal Circuit explained, these two concepts were not "commensurate" because it was, in fact, possible to effectively search all the memory with out examining all the records in memory. Id. Thus, unlike the instant case, the accused infringer in Superguide was seeking a construction that did not fairly correspond to the statements the patentee made during prosecution. Furthermore, in Superguide, the Federal Circuit, after reviewing the prosecution history, affirmatively understood the patentees as distinguishing their invention from the prior art merely on the basis of the prior art not requiring any searching of memory at all. Id. Here, however, the Court, after reviewing the relevant portions of the prosecution history, cannot conclude that the patentee was distinguishing the prior art on some basis other than the "limiting data" and "video product" being transmitted "concomitantly" as part of the same "data stream." Indeed, the

13

patentee, in response to the examiner's rejection, affirmatively stated that the "invention" was "limited in accordance with data that is transferred concomitantly as part of the down-loaded digital data stream." (D.I. 63, Exh. G at 3-4 (emphasis added).) And, even if there were some other basis upon which the patentee could have instead distinguished key prior art references, the Court cannot simply disregard these unambiguous statements in the prosecution history. See Atofina v. Great Lakes Chem. Corp., 441 F.3d 991, 998 (Fed. Cir. 2006) ("That the applicants only needed to surrender nickel-chromium catalysts to avoid a prior art reference does not mean that its disclaimer was limited to that subject matter.").

Finally, the Court cannot give great weight to the fact that the '387 patent is incorporated into the '402 patent by reference. In the Court's view, the specification of the '402 patent is not, as Plaintiff contends, relying on the '387 patent to set forth components of an embodiment of the claimed invention. The '402 patent discusses '387 patent only in the "Description of the Prior Art" and criticizes it for its failure to "limit the use a customer may make of a down-loaded program." (See '402 patent at 1:13-44.) The Court identifies no additional discussion of or references to the '387 patent anywhere else in the specification of the '402 patent, including in the description of the preferred embodiments. Furthermore, Plaintiff

14

cites no cases, and the Court is aware of none, suggesting that a
prior art reference, when relied upon in this manner, can be
understood to correspond to an embodiment of the claimed
invention.

**B. "A Digital Data Stream Comprising Said Video Product, Data Establishing A Time Period During Which Viewing Of Said Video Product Is Authorized"**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| No construction proposed. | Data transmitted from the central station to the user site as a single, continuous stream of digital data that includes both the video product and the data establishing a period during which viewing of the video product is authorized |

For the reasons stated in Part III.A supra, the Court will
construe this claim term to mean, as Defendant contends, "[d]ata
transmitted from the central station to the user site as a
single, continuous stream of digital data that includes both the
video product and the data establishing a period during which
viewing of the video product is authorized."

15

## C. "Central Station"

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| One or more computers or other data processing devices operated together in order to deliver video on demand service to a user site. | A station in a single location, remote from the user site, where video products (such as movies and video games) and date used to limit viewing of the video products are stored. |

The core dispute between the parties is whether the "central station" must be situated in a "single location" (Defendant's position) or not (Plaintiff's position).

In support of its construction, Plaintiffs relies largely on the fact that the specification, in describing the prior art, incorporates by reference the '387 patent, which, according to Plaintiff, shows a "central data station" that includes both a "host computer" and "memory modules" that are each distinct data transmission sources. (D.I. 64 at 6.) The specification of the patent-in-suit further describes the '387 patent as including a "host computer" that transmits data "in conjunction with other electronics." ('402 patent at 1:31-35.) Finally, Plaintiff notes that the specification of the '402 patent describes the data link connecting the "central station" and "user site" as possibly being a fiber optic link, publically switched link, telephone link, satellite wireless link, or cable television link, which one of skill in the art would allegedly recognize as being geographically distributed. (See D.I. 64 at 6.) In light

16

of these disclosures, Plaintiff contends that the specification confirms that the central station can include one or more devices and that "there is no geographical restriction in connection with central station." (See D.I. 69 at 6:9-7:10.) Rather, what is important, Plaintiff contends, is that the components of the "central station" possess some level of "logical connectivity" so that they may "work together." (See D.I. 69 at 12:8-19.)

Defendant responds, first, that the specification only appears to disclose an embodiment in which the central station is at a single location. For instance, according to Defendant, by explaining that the "time limit" "can be encoded at the central station," the specification confirms that the limiting data and video product are stored at the same location. (See D.I. 63 at 15-16.) Likewise, according to Defendant, both figures in the patent show the "cental station" as being at only a single location and only one transmission path from the "central station" to the "user site." (Id. at 16; D.I. 69 at 46:6-17.) Though pointing to this evidence in the specification, Defendant's principal argument on this claim term appears to be that its proposed construction follows from its construction for the "data stream" terms, which, as explained above, is well supported by the prosecution history. (See supra Part II.A.) Briefly, Defendant contends that "if the video product and limiting data are transmitted together as part of the same data

17

stream, then they must be transmitted from the single location."
(D.I. 63 at 16.)

After reviewing the specification and the parties' arguments
on this term, the Court concludes that the specification simply
does not speak in any particularly helpful way as to the meaning
of "central" in the term "central station," and, in particular,
to the issue of whether the term "central" refers to geographic
centrality, logical centrality, or some combination of both.
With respect to Plaintiff's arguments regarding incorporation by
reference of the '387 patent, for the reasons stated above, the
Court will not give the '387 patent significant weight. As to
Plaintiff's argument regarding the nature of the data link, the
Court finds that the specification treats the data link as a
distinct and separate structure from the "central station."
(See, e.g., '402 patent at 2:56-59 ("A customer site, indicated
within the dashed block 10, is connected by a high-speed data
link 12 to a remote central station 14.").) Accordingly, the
Court does not find the patent's description of the "data link"
to be particularly illuminating as to the nature of the "central
station." At the same time, the Court is reluctant to adopt
Defendant's construction because it limits "central station" to a
structure that is in a "single location" geographically. The
Court sees no basis in the specification for adopting such a
limiting construction. In addition, the Court shares Plaintiff's

18

concern that Defendant's introduction of the concept of a "single location" will create unnecessary ambiguity in the claims. (See D.I. 63 at 5.)

Nevertheless, the term "central" cannot be mere surplusage, and the Court is compelled to give it some meaning. In this regard, the Court considers the prosecution history. Specifically, the Court agrees with Defendant that the construction of this term is informed by the patentee's unambiguous statements during prosecution confirming that the "central station" transmits the limiting data and video product together as a single data stream. Accordingly, the "central station" must be sufficiently "central" - either logically or geographically - such that this may occur. The Court will thus construe "central station" to mean "one or more computers or other data processing devices operated together in order to a transmit a single, continuous stream of digital data that includes both the video product and data used to limit viewing of the video products."

**D. "Decoding Said Data Establishing A Limit"**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| The interpretation by a computer program or hardware logic operating at the user site of the data values that set an expiration threshold. | At the user site, extracting the data establishing a limit for authorized viewing of the video product from the downloaded digital data stream in order to separate the data establishing the authorized viewing limit from the video product. |

The parties' dispute over this term follows from their

dispute over the "data stream" claim terms.  Briefly Defendant

contends that because the limiting data and "video product" are

transmitted together in a single, continuous "data stream," the

"decoding" limitation must, at the very least, refer to the

"extraction" or "separation" of the limiting data from the "data

stream."  (See D.I. 69 at 54:23-55:19.)  In further support of

this construction, Defendant notes that the specification states

that "[r]eferring now to FIG. 3 in addition to FIG. 2, in

operation, the limit data is decoded from the down-loaded data

stream . . . ."  ('402 patent at 4:30-32 (emphasis added).)

Plaintiff responds that Defendant's construction would

improperly exclude embodiments in which the limiting data and

video product are not transmitted together in a single continuous

"data stream."  (D.I. 66 at 23.)  Plaintiff further remarks that

it is not aware of any definition for "decoding" that includes

"separating" and any suggestion in the specification that the

limiting data needs to be "decoded from" the "data stream" is merely a description of a specific embodiment.

The Court agrees with Plaintiff that language in the specification referring to data being "decoded from" the "data stream" is a description of a specific embodiment. (See '402 patent at 4:30-32.) However, in view of the patentee's unambiguous statements in the prosecution history confirming that the limiting data and "video product" are transmitted together, the Court finds that this language does in fact refer to the claimed embodiments. Likewise, in view of the prosecution history, other disclosed embodiments, including those in which limiting data is "permanently stored at the customer site" so that the "down-loaded data need not include such user limitation data," do not correspond to claimed embodiments. ('402 patent at 3:65-68.) Thus, the Court agrees with the Defendant that the "decoding," as used in the claims, must include some "extraction" of the limiting data from the "data stream." Accordingly, the Court construes the claim term "decoding said data establishing a limit" to mean, as Defendant contends, "at the user site, extracting the data establishing a limit for authorized viewing of the video product from the downloaded digital data stream in

21

order to separate the data establishing the authorized viewing
limit from the video product."[2]

**E.  "Comparing An Output Of A Local Clock Signal Generator
With Said Result Of Said Decoding Step"**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Using an operating computer program or hardware logic to determine whether the local time indicated by the equipment at the user site is prior to, equal to, or after the expiration time indicated by the result of the interpretation of the data values that set an expiration threshold. | Comparing the output of a time-of-day clock generator at the user site with the result of the decoding step. |

Neither party addressed this term during the Markman
hearing, and the parties devoted little attention to this claim
term in their claim construction briefing.  After reviewing this
briefing, the only dispute the Court is able to discern is
whether the "local clock signal" must come from only a "time-of-
day clock" (Defendant's position) or not (Plaintiff's position).
Based on the parties' proposed constructions, the parties agree
that the "local clock signal generator" is located "at the user
site."

In support of the position that the "local clock signal" is
referring to a "time-of-day" clock, Defendant contends that the

---

[2] This construction is not intended to exclude the presence
of additional steps that may be related to the decoding process.

only embodiment described in the specification appears to use a time-of-day-clock. (See D.I. 63 at 18-19; see also, e.g., '402 patent at 4:37-38 ("In the case of a time limit, this comparison can be made with the time-of-day clock . . . ."). Plaintiff responds that this claim limitation can be referring to "more than 'time of day' but also may include any time and date that indicate a relevant time period." (D.I. 66 at 25.) Defendant's attempt to limit this claim limitation to a "time-of-day" clock is, Plaintiff contends, merely an attempt to import a limitation from the specification into the claims.

The Court agrees with Plaintiff that, although "time-of-day" clocks are mentioned in the specification, there is no good reason to limit the claims to this particular embodiment in the specification. Nevertheless, the Court will not adopt Plaintiff's proposed construction. Plaintiff's construction introduces unnecessary verbiage and limitations into the claims, including the use of "an operating computer program or hardware logic," and a comparison of whether the "local time" is "prior to, equal to, or after the expiration time." In the Court's view, none of this would illuminate the meaning of this claim term to one of skill in the art. Accordingly, the Court will construe "comparing an output of a local clock signal generator with said result of said decoding step" to mean "comparing an output of a clock signal generator at the user site with said

23

result of said decoding step." This construction conforms most closely to the clear language of the claim, yet at the same time confirms that the "clock signal" is not limited to a "time-of-day" clock and further reflects the parties' agreement that the "local clock signal generator" is located at the "user site."

**F. "Storing A Result Of Said Decoding Step"**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| The input of one or more data items resulting from the interpretation of the data values that set an expiration threshold into a memory device from which such data items may be retrieved. | Storing at the user site the extracted data. |

The core dispute between the parties appears to be whether the "result" of the "decoding step" must be "extracted data" (Defendant's position) or not (Plaintiff's position). The Court sees no need to construe the "result" of the "decoding" step to refer to "extracted data." In light of the Court's construction of the "decoding" limitation, which already calls for the limiting data to be "extracted" from the "data stream," such language would be superfluous. Likewise, the Court is reluctant to adopt Plaintiff's construction, which, in the Court's view, is merely a verbose paraphrasing of the claim language that otherwise offers little to assist one of skill in the art in understanding the claims. Indeed, Plaintiff, relying on dictionary definitions, contends that their proposed construction

24

simply corresponds to the ordinary meaning that, for this term, is "readily apparently to even lay judges." (See D.I. 64 at 14 (citing Phillips v. AWH, 415 F.3d 1303, 1314 (Fed. Cir. 2005)).) The Court agrees with this sentiment, but disagrees with Plaintiff that the claim term needs paraphrasing with dictionary definitions. Thus, the Court will not adopt Plaintiff's proposed construction either.

The parties' proposed constructions further appear to reflect a dispute as to whether the result of the decoding step must be stored "at the user site" (Defendant's position) or not (Plaintiff's position). However, after reviewing the briefing, the Court is unable to discern a genuine dispute over this aspect of Defendant's construction. Indeed, at no point in its briefing does Plaintiff directly address this issue. Likewise, during the Markman hearing Plaintiff did not address this issue. Furthermore, Plaintiff appears to agree with Defendant that the "decoding" and "comparing" steps of the claims occur at the "user site." It would make little sense for Plaintiff to contend that the "storing" of the decoded information takes place at a location other than the location of its "decoding" and subsequent use in determining whether viewing limits have been exceeded.

In any event, the Court concludes that the claims confirm that the "storing" of the decoded information takes place at the user site. In particular, the claims explicitly recite that the

limiting data is transmitted to the "user site." ('402 patent at 6:3-7, 5:3-7, 4:58-61.) Having been transmitted to the "user site," the limiting information must also be stored there. Plaintiff does not point to any evidence in the specification or claims suggesting any other possibility. The Court will thus adopt Defendant's construction to the extent it calls for the decoded information to be stored at the "user site."

Accordingly, the Court will construe "storing a result of said decoding step" to mean "storing at the user site a result of said decoding step."

G.   "Erasing Said Video Product"

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| To remove or obliterate the downloaded and stored video data from the storage locations where the video data is stored, such as to clear, overwrite or designate as deleted such storage locations. | At the user site, deleting the video product from memory entirely; this does not include scrambling or other methods of limiting access to the video product. |

Defendant agrees with Plaintiff that this claim term refers, at least, to removing or obliterating the downloaded and stored video data. (See D.I. 65 at 13.) Furthermore, Plaintiff does not appear to take issue with Defendant's position that the erasing must take place at the "user site." Thus, the dispute between the parties is whether this claim term also refers to

"scrambling" or "designating as deleted" (Plaintiff's position)
or not (Defendant's position).

Plaintiff draws its proposed construction largely from the
Federal Standard 1037C Glossary of Telecommunications Terms,
which defines "erase" as "[t]o obliterate information from a
storage medium, such as to clear or to overwrite." (D.I 64, Exh.
L.) Plaintiff further points to the Merriam-Webster OnLine
Dictionary, which sets forth a quaternary definition for "erase"
as "to delete from a computer storage device." (Id., Exh. M.)
Based on this, Plaintiff apparently contends that the claim term
should be defined to also encompass designating storage locations
as being deleted. Notably, both of Plaintiff's dictionary
definitions postdate the filing of the '402 patent.

In response, Defendant points to the following excerpts from
the specification:

- "In one embodiment, the control system erases or
  scrambles the stored program after it has been
  viewed a predetermined number of times (e.g.,
  once), and in other embodiment the program is
  erased or scrambled after a predetermined interval
  (e.g., 24 hours)." ('402 patent at 2:21-26
  (emphasis added).)

- "Control unit 22 also erases or otherwise (e.g.,
  scrambles) limits access to the stored data after
  a use limit specified by the central station or
  fixed at the customer site have been met or
  exceeded . . . ." (Id. at 3:22-25 (emphasis
  added).)

- "If the result of the comparison step at block 54
  is affirmative, the microprocessor 30 issues a
  command to controller 44 to erase the video data
  stored in memory 20 or to otherwise block access

27

to the data by the television set 18." (Id. at
4:44-49 (emphasis added).)

Based on these excerpts, Defendant contends that the
specification distinguishes erasing of the data from other
methods of limiting access, such as scrambling.

The Court agrees with Defendant that the specification
clearly distinguishes "erasing" from scrambling and other methods
of blocking access. In light of this intrinsic evidence, which
speaks directly to the dispute between the parties, the Court is
reluctant to rely on Plaintiff's dictionary definitions. Indeed,
both dictionary definitions postdate the filing of the patent.
Furthermore, in the Court's view, neither of the definitions
legitimately support the notion that "erasing" should include
designating storage locations as being deleted. Because the
parties agree that this claim term refers to "removing or
obliterating the downloaded and stored video data," the Court
will define it as such. In addition, the Court will clarify that
this term does not refer to scrambling or other methods of
blocking access. Finally, the Court notes that Defendant's
proposed construction requires that the "erasing" take place at
the "user site." In reviewing Plaintiff's briefing on this term,
the Court does not detect any opposition to this position.
Furthermore, as explained above, because the claims explicitly
call for the video product to be transmitted to the "user site,"
it must be that the "video product" is also ultimately erased at

the "user site." Accordingly, the Court will construe "erasing said video product" to mean "at the user site, removing or obliterating the downloaded and stored video data; this does not include scrambling or other methods of limiting access to the video product."

**H.     "User Site"**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| The combination of equipment located remotely from the central station used by the viewer to receive from the central station and access a video product. | No construction necessary. |

In the Court's view, the parties do not have a genuine dispute regarding this term. Indeed, in its Opening Claim Construction Brief, Plaintiff devoted only one short paragraph to this term, (see D.I. 64 at 7), and then failed to address it in its Responsive Claim Construction Brief. Defendant devoted no attention to this term during claim construction briefing. Neither party addressed the term during the Markman hearing. To the extent Defendant addressed this term, it was only in a table summarizing the parties' claim construction position that was included in a bench book submitted during the Markman hearing.

Plaintiff's proposed construction is an attempted generalization of a description and figure in the specification pertaining to a preferred embodiment. (Id.) The Court sees no

reason to import such descriptions of preferred embodiments into
the claims, especially where, as here, there does not appear to
be a meaningful dispute over the meaning of the claim term.
Furthermore, the Court finds no evidence that Plaintiff's
proposed construction would illuminate the meaning of "user site"
to one of skill in the art. Accordingly, the Court concludes
that no construction is necessary for this term.

## I. "Video Product"

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| A set of downloaded and stored video data that contains a video program. | No construction necessary. |

With respect to whether the parties have a dispute over the
meaning of this claim term, much the same situation exists for
this claim term as for the claim term "user site." (See supra
Part III.H.) Based on this, the Court is inclined to agree with
Defendant that no construction is necessary for this term.
Furthermore, the Court does agree with Defendant that the
references to "downloaded" and "stored" data in Plaintiff's
proposed construction are surplusage in light of the explicit
references in the asserted claims to the "transmitting" and
"storing" of data, respectively. (See D.I. 65 at 11-12.)
Accordingly, the Court concludes that no construction is
necessary for this term.

### J. "Data Establishing A Limit For Authorized Viewing Of Said Video Product"

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| One or more data values that set an expiration threshold for either a limited viewing time period or a limited number of views of a video product or a combination thereof. | No construction necessary. |

Much like the claim terms "user site" and "video product," the parties do not appear to have a meaningful dispute over the meaning of this term. Indeed, neither party addressed this term during the Markman hearing.

Furthermore, as with the claim term "user site," Plaintiff's proposed construction appears to be a conglomeration of the description of the preferred embodiments in the specification. Again, the Court sees no reason to import such descriptions from the specification into the claims. Nor is the Court persuaded that Plaintiff's proposed construction will illuminate the meaning of this claim term to one of skill in the art. Accordingly, the Court concludes that no construction is necessary for this term.

### CONCLUSION

An Order consistent with this Memorandum Opinion will be entered setting forth the meanings of the disputed terms and/or phrases in the '402 patent.

31