IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN PATENT DEVELOPMENT, | : | |
| CORPORATION, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 07-605-JJF |
| | : | |
| MOVIELINK, LLC, | : | |
| | : | |
| Defendant. | : | |
| | : | |

Mark W. Wasserman, Esquire and Matthew R. Sheldon, Esquire of
REED SMITH LLP, Falls Church, Virginia.
Mark W. Eckard, Esquire of REED SMITH LLP, Wilmington, Delaware.
Ted Sabety, Esquire, of Sabety & Associates, PLLC, New York, New
York.

Attorneys for Plaintiff American Patent Development Corporation,
LLC.

Scott W. Breedlove, Esquire; Andrew E. Jackson, Esquire; David
Tobin, Esquire and Gentry C. McLean, Esquire of VINSON & ELKINS
LLP, Dallas, Texas.
Jeffrey L. Moyer, Esquire and Sarah R. Stafford, Esquire of
Richards, Layton & Finger, P.A., Wilmington, Delaware.

Attorneys for Defendant Movielink, LLC.

**MEMORANDUM OPINION**

July ___, 2009
Wilmington, Delaware

Farnan, District Judge

Pending before the Court are Plaintiff's Motion For Partial Summary Judgment On Infringement (D.I. 124) and Defendant Movielink LLC's Motion For Partial Summary Judgment Of Non-Infringement (D.I. 128). For the reasons discussed, the Court will grant Defendant's Motion and deny Plaintiff's Motion.

## I. BACKGROUND

### A. Procedural Background

This is a patent infringement case brought by American Patent Development Corporation, LLC against Movielink, LLC, alleging infringement of United States Patent No. 5,400,402 ("the '402 patent"), which pertains to systems for controlling the use of video-on-demand programming. (See, e.g., '402 patent at 1:13-20.)

The parties briefed their respective positions on claim construction, and, on October 15, 2008, the Court conducted a Markman hearing on the disputed terms. On March 27, 2009, the Court issued a Memorandum Opinion construing the disputed terms. (See D.I. 104.) On April 9, 2009, the Court held a pre-trial conference, during which the Court set a revised schedule for the parties to submit revised summary judgment briefing taking into account the Court's claim constructions. The parties then submitted summary judgment briefing in accordance with that schedule.

**B. Factual Background**

The '402 patent relates to a simple, inexpensive system for limiting the use of a downloaded video program purchased by a customer. In this scheme, a "central station" transmits a "video product" to a customer at a "user site." The claims are directed to control systems for limiting the customer's access to the video programming after certain viewing limits have been reached. (See '402 patent at 2:14-37.) Specifically, the "central station" transmits not just a "video product," but also data that sets limits on the extent to which the customer may view the "video product." For instance, the customer may be allowed to view the "video product" only for a limited duration or, alternatively, the customer may be allowed to access the "video product" only a certain number of times. (See '402 patent at 2:27-37.) Thus, the asserted claims include steps directed to "transmitting" a "video product" and limiting data, "decoding" the limiting data, "storing" this limiting data, and then subsequently either blocking access to or erasing the "video product" if it is determined that the viewing limits are exceeded.

APDC asserts that the Movielink video-on-demand service infringes claims 1 and 2 of the '402 patent, either literally or under the doctrine of equivalents. Representative Claim 1 of the '402 patent is as follows:

2

> 1.  A method for providing a video product from a
> central station to a user site, comprising the steps
> of:
>     transmitting from said central station to said user
>         site a digital data stream comprising said video
>         product, and data establishing a limit for
>         authorized viewing of said video product;
>     storing said video product at said user site;
>     decoding said data establishing a limit for
>         authorized viewing of said video product;
>     storing a result of said decoding step;
>     blocking access to said video product stored at said
>         user site if said limit for authorized viewing is
>         exceeded.

('402 patent at 4:56-68.)

The claim construction dispute of greatest importance

concerned whether the "central station" must transmit the "video

product" and limiting data to the "user site" together as part of

a single, continuous "data stream" (Defendant's position) or not

(Plaintiff's position).  Based on the prosecution history, the

Court agreed with Defendant that the claims did, in fact, require

concomitant transmission of both the "video product" and the

"data establishing a limit."  Accordingly, the Court construed

the claim term "a digital data stream comprising said video

product, and data establishing a limit for authorized viewing of

said video product" to mean "data transmitted from the central

station to the user site as a single, continuous stream of

digital data that includes both the video product and the data

establishing a limit for authorized viewing of the video

product."  (See D.I. 104 at 7-15.)  The Court provided a similar

construction for a parallel term appearing in Claim 2 of the '402 patent. (See id. at 15.) Thus, the Court construed both asserted claims of the '402 patent to require transmission of the "video product" and "data establishing a limit" in a single, continuous data stream.

According to APDC, the accused Movielink video-on-demand service operates in the following manner. A customer wishing to use the Movielink service to view video content must first download and install the Movielink Manager software on his or her computer. (D.I. 126 ¶ 10.) When the customer requests a video product, such as a movie, from the Movielink service, the Movielink Manager requests a download of the product from a cluster of server-computers controlled by Movielink. (Id. ¶¶ 9, 11.) In response, the server-computers transmit to the customer's computer a single data stream containing (1) the video product and (2) a unique numerical index value called a "Key Identifier" ("KID"), which is stored in the "header" of the video product. (Id. ¶ 12.) As soon as the product download is commenced, the Movielink Manager extracts the KID value from the header and transmits it to a Movielink license server, which generates a license string for the downloaded product. (Id.) The license string contains (1) a "usage rule," which sets forth, for example, a time limit for viewing of the product, and (2) the KID value. The license string is transmitted to the user's

computer, where it is stored in a dedicated license file. (Id. ¶ 13.) When a customer wishes to view the downloaded video product, the Movielink Manager, in conjunction with Microsoft Digital Rights Management software, matches the KID value in the video product "header" to the KID value of a license string in the dedicated license file. (Id. ¶¶ 16-17.) The usage rule in the license string is then evaluated to determine whether the user still has permission to view the video product. (Id. ¶ 18.) If the user is no longer permitted to view the video product, the Movielink Manager prevents further access to the movie by (1) issuing a command to delete the video product, and (2) "shredding" the memory location where the product was stored. (Id. ¶ 19.) Otherwise, the user may proceed to view the video product.

## II. DISCUSSION

### A. Applicable Legal Principles

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In determining whether there are triable issues of material fact, a court must

5

review all of the evidence and construe all inferences in the light most favorable to the non-moving party. However, a court should not make credibility determinations or weigh the evidence.

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" However, the mere existence of some evidence in support of the nonmovant will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmovant on that issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

A patent is infringed when a person "without authority makes, uses, offers to sell, or sells any patented invention, within the United States, or imports into the United States any patented invention during the term of the patent . . . ." 35 U.S.C. § 271(a). Determining infringement requires a two step inquiry. Step one requires a court to construe the disputed terms of the patent at issue. Step two requires a court to compare the accused products with the properly construed claims of the patent. Step one is a question of law; step two is a question of fact. Markman v. Westview Instruments, Inc., 52 F.3d 967, 979-81 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370

(1996).

Infringement may be proven under either of two theories: literal infringement or the doctrine of equivalents. Literal infringement occurs when each element of at least one claim of the patent is found in the alleged infringer's product. Panduit Corp. v. Dennison Mfg. Co., 836 F.2d 1329, 1330 n.1 (Fed. Cir. 1987). "The doctrine of equivalents allows the patentee to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes." Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 733 (U.S. 2002). "An element in the accused device is equivalent to a claim limitation if the only differences between the two are insubstantial." Honeywell Int'l v. Hamilton Sundstrand Corp., 370 F.3d 1131, 1139 (Fed. Cir. 2004). The party asserting infringement has the burden of proof and must meet its burden by a preponderance of the evidence. SmithKline Diagnostics, Inc. v. Helena Lab. Corp., 859 F.2d 878, 889 (Fed. Cir. 1988) (citations omitted).

## B. Defendant's Motion For Partial Summary Judgment of Non-Infringement

Defendant moves for summary judgment of non-infringement of both Claims 1 and 2 of the '402 patent. The Court will address each of these claims in turn.

### 1.   Claim 1

As to Claim 1 of the '402 patent, Movielink contends that it does not literally infringe because it "does not and has not performed any of the steps" of the claim.  (D.I. 129 at 10.) Movielink makes technical arguments as to why its product does not perform the "transmitting" and "decoding" steps of the Claim. For the remaining steps of Claim 1, Movielink contends they were performed not by Movielink but "by a user on the user's computer."  (Id. at 19.)  In these circumstances, Movielink contends that it can be held liable as a direct infringer only under a "joint infringement" theory, which Movielink contends APDC has both failed to plead and cannot prove as a matter of law.  The Court will address each of these three theories of non-infringement in turn.

### a.   Whether The Movielink Product Meets The "Transmitting" Limitation

#### i.   The Parties' Contentions

The limitation of greatest contention concerns the "transmitting" step of the claim.  With respect to this step, Movielink argues that "[b]ecause Movielink delivered a movie download and the license for viewing the movie in separate transmissions from separate servers that did not communicate with one another, and in response to separate requests from the user's computer, its movie and limit data were not transmitted as part of the same digital data stream."  (Id. at 10.)  However, APDC

8

notes, and Movielink does not appear to dispute, that the KID value is transmitted along with the downloaded video product. The KID value, APDC contends, is "data establishing a limit" because it "brings about or effectuates limits on viewing the downloaded movie file." (D.I. 126 at 10.) More specifically, APDC notes that the KID value is used to both (1) generate a license string for the video product and (2) index into the dedicated license file to retrieve a "usage rule" for the video product. (Id. at 13.) Movielink responds that APDC's expert witness, Mr. Bruce McNair, has not adduced evidence to establish that the KID is used in this manner and, more importantly, that APDC's attempt to "shoehorn" the KID into the term "data establishing a limit" improperly expands the scope of the claim far beyond its plain and ordinary meaning. (D.I. 129 at 11.) To the extent APDC contends that the Movielink service satisfies this claim limitation under the doctrine of equivalents, Movielink argues that prosecution history estoppel makes the doctrine of equivalents unavailable for this limitation and, in any event, that the KID is not equivalent to "data establishing a limit." (Id. at 23-26.)

## ii. Decision

Central to the parties' dispute is the term "data establishing a limit." During the claim construction process,

9

APDC identified this term as requiring construction.[1] (See D.I. 64 at 8-9.) However, the parties declined to brief the term in great detail and then failed to mention it altogether during the Markman hearing. Accordingly, the Court noted that the parties did not appear to have a meaningful dispute as to the construction of this term. The Court further noted that APDC's proposed construction was unacceptable because it limited the "data establishing a limit" to particular embodiments set forth in the specification. (D.I. 104 at 31.) In particular, APDC's proposed construction constrained "data establishing a limit" to only data setting forth a limited viewing period and/or a limited number of views. Unsatisfied with APDC's proposed construction, and, more importantly, uncertain that there was a genuine dispute as to the meaning of this term, the Court declined to offer a construction, a result that Movielink in fact suggested was appropriate. (See D.I. 65 at 12.)

However, in the wake of the Court's claim construction opinion, it is clear that the parties dispute over the meaning of "data establishing a limit" has sharpened. Specifically, the Court understands the parties as disputing whether the "data establishing a limit" must, by itself, include actual threshold parameters setting forth limits for viewing of the video product

---

[1] APDC proposed that this term be construed to mean "one or more data values that set an expiration threshold for either a limited viewing time period or a limited number of views of a video product or a combination thereof." (D.I. 64 at 8.)

(Movielink's position) or not (APDC's position). Or, in other words, the parties dispute whether the "data establishing a limit" can be content that is merely utilized in a process for determining or retrieving actual viewing limits (APDC's position) or not (Movielink's position). The Federal Circuit has explained that "[a]fter the court has defined the claim with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper construction, the task of determining whether the construed claim reads on the accused product is for the finder of fact." PPG Indus. v. Guardian Indus. Corp., 156 F.3d 1351, 1355 (Fed. Cir. 1998). However, the Court concludes that this case has not yet progressed to a stage where it can be handed over to the trier of fact. Indeed, although the parties have not prepared formal supplemental claim construction briefs, in support of their Motions for Summary Judgment, both Movielink and APDC have submitted competing dictionary definitions, expert testimony, and argument regarding the meaning of the word "establishing." (See D.I. 126 at 11-12; D.I. 127 at 132, 181-82, 217-20; D.I. 138 at 291-98; D.I. 139 at 17-18; D.I. 130, Exh. B at ¶¶ 22-25.) Having reviewed the parties' briefing, it is, in the Court's view, inevitable that the parties would attempt to present this evidence at trial and thus argue claim construction to the jury. The Court cannot allow this. See O2 Micro Int'l Ltd. v. Beyond

Innovation Tech. Co., 521 F.3d 1351, 1361-63 (Fed. Cir. 2008) (criticizing a district court that allowed the presentation of expert testimony on claim construction after the court declined to construe a disputed claim term).

Accordingly, the Court is compelled to resolve the parties' latent claim construction dispute. In this respect, the Court turns to the specification of the '402 patent. First, the Court notes that in the "SUMMARY OF THE INVENTION," the Court finds that two - and only two - embodiments of the invention are described and distinguished. "In one embodiment the stored program is erased . . . based on fixed criteria stored at the customer site. In another embodiment, the down-loaded data includes instructions that specify and controls the number of times the stored data may be accessed, or the period during which the stored material may be accessed, or any combination thereof." '402 patent at 2:27-35. Thus, the patent distinguishes between an embodiment where the data that "specif[ies] and controls" access to the video product is transmitted with the video product, and another in which it is stored at the customer site. This distinction is repeated elsewhere in the specification:

- "Control unit 22 also erases or otherwise (e.g., scrambles) limits access to the stored data after a use limit specified by the central station or fixed at the customer site have been met or exceeded . . . ." ('402 patent at 3:22-26.)

- "Alternatively, the stored program can be erased
  after a predetermined interval (e.g., 24 hours) or
  fixed predetermined number of accesses (e.g., one)
  which is fixed by data permanently stored at the
  customer site or specified by instructions
  included with the downloaded data." (Id. at 3:45-
  50.)

- "It will also be appreciated that limiting data
  may be permanently stored at the customer site, in
  which [case] the down-loaded data need not include
  such user limitation data." (Id. at 3:65-68.)

Thus, the specification explains, among other things, that the

limiting data transmitted with the video product "specif[ies] and

controls" access to the video product or that it "specifies"

video product use limits. In the Court's view, the

specification's use of the terms "control" and "specify" to

describe the "data establishing a limit" tends to suggests that

it is self-contained and that it explicitly – rather than

implicitly – sets forth limiting viewing parameters. Moreover,

the "permanent" or "fixed" storage of limiting data at the

customer site is distinguished as a separate embodiment from the

transmission of limiting data with the video product.  On

reviewing the specification, the Court sees no evidence that a

mixed embodiment was contemplated in which the viewing parameters

are determined partly through the use of content transmitted with

the video product and partly through the use of content stored at

the user site, further suggesting that the "data establishing a

limit" should be self-contained and include specific parameters

of the limits on use of the video product.

In the Court's view, the prosecution history tends to support this understanding of the term "data establishing a limit." Indeed, during prosecution the patentee stated, among other things, that "[i]n accordance with the applicant's invention, the user's access to the video product is limited in accordance with data that is transferred concomitantly as part of the down-loaded digital data stream." (D.I. 63, Exh. G at 3-4 (emphasis added).) Likewise, the patentee explained that the revised claims "specifically point out that time limiting data is transferred to the user site as part of the down-loaded data stream that includes the video product." (D.I. 63, Exh. G at 6 (emphasis added).) Thus, the patentee specifically stated that viewing is to be restricted "in accordance with" data that is actually transmitted with the video product and, also, that the "data establishing a limit" is actual "time limiting data." In the Court's view, these statements are most reasonably understood as conveying the idea that the limiting data contains parameters that directly specify viewing limits. Indeed, it would, for instance, be unusual to state that viewing is limited "in accordance with" information, such as the KID, that does not actually set forth any limiting parameters.

Nevertheless, APDC's expert witness, Mr. Bruce McNair, opines that "[o]ne of ordinary skill in the art would consider the word 'establishing' in the patent claims to indicate a mere

14

causal relationship." (D.I. 127 at 132.) Along these lines, APDC points out that a quaternary dictionary definition for the word "establish" is "to bring about." (See D.I. 126 at 11 (citing Webster's 7th New Collegiate Dictionary at 284 (1976).) Thus, APDC advocates a broad meaning of "establish" that would require only a minimal link or "causal" connection between the "data establishing a limit" and the actual threshold viewing parameters. However, in the Court's view, this stretches the plain and ordinary meaning of "establishing" to the outer brink. Indeed, in the dictionary relied upon by APDC, the primary definition for the term "establish" is "to make firm or stable." (D.I. 127 at 219 (Webster's 7th New Collegiate Dictionary at 284 (1976).) This definition calls to mind much more than a tenuous causal relationship between the "data establishing a limit" and the actual threshold viewing parameters. And, in further view of the intrinsic evidence set forth above, the Court concludes that this is the understanding that should apply here. Accordingly, the Court will construe "data establishing a limit" to mean, as Movielink contends, "data that includes parameters setting forth actual limits for viewing of the video product." This construction makes clear that the "data establishing a limit" must be more than an index or identifier that has some causal connection to the actual limiting data, yet at the same time does

15

not restrict the limiting data to either a viewing period or a certain number of viewing sessions.

In light of this claim construction, the Court will grant Movielink's Motion to the extent it seeks summary judgment on the issue of literal infringement because the KID value transmitted with the video product does not contain actual threshold viewing parameters. Such parameters are instead transmitted as part of a "license string" in a separate data stream. Furthermore, as a result of this claim construction, APDC may no longer rely on the doctrine of equivalents for this element. Indeed, "[i]t is important to ensure that the application of the doctrine [of equivalents], even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety." Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17 (U.S. 1997). Here, APDC contends that an equivalent of the "data establishing a limit" element is information that is merely used as an index or identifier of separately transmitted data that contains actual threshold viewing parameters. However, viewing this as an equivalent of the "data establishing a limit" element would vitiate the requirement of the Court's construction that the "data establishing a limit" include "actual limits for viewing of the video product." Accordingly, the Court will further grant Movelink's Motion to the extent it seeks summary judgment of non-infringement under the doctrine of equivalents.

Movielink further argues that prosecution history estoppel prohibits APDC from relying on this theory of infringement. For the sake of completeness, the Court will address this issue. Briefly, Movielink notes that after the examiner rejected the originally submitted claims over two prior art references, the patentee cancelled the originally filed claims and submitted a new set of claims that introduced for the first time the "data establishing a limit" claim element. (See D.I. 63, Exh. G.) The addition of a new claim limitation, if made for a reason related patentability, will give rise to presumption of estoppel. See Honeywell Int'l v. Hamilton Sundstrand Corp., 370 F.3d 1131, 1140 (Fed. Cir. 2004). On reviewing APDC's opposition to Movielink's Motion For Summary Judgment, APDC does not appear to dispute that a claim element was added for reasons related to patentability such that a presumption of estoppel would apply.

Rather, APDC argues only that it has rebutted the presumption of estoppel. (See 126 at 32-33; D.I. 137 at 18.) "[T]he presumption of surrender may be rebutted if the patentee can demonstrate that: (1) 'the alleged equivalent would have been unforeseeable at the time . . . the narrowing amendment' was made; (2) 'the rationale underlying the narrowing amendment bore no more than a tangential relation to the equivalent' at issue; or (3) 'there was 'some other reason' suggesting that the patentee could not reasonably have been expected to have

17

described the alleged equivalent.'" Id. (citing Festo Corp. v.
Shoketsu Kinzoku Kogyo Kabushiki Co., 344 F.3d 1359, 1368 (Fed.
Cir. 2003).) APDC contends that the rationale for the amendment
is tangential to the equivalent it seeks. Specifically, APDC
asserts - with little explanation and no citations to record
evidence - that the claim amendments pertained strictly to the
way the limiting data is provided, and that this issue is
distinct from the content of the limiting data, which is the
subject matter of the sought after equivalent. (D.I. 137 at 18.)

The Court has reviewed the relevant portions of the file
history and, although it is a close question, concludes that the
presumption of prosecution history estoppel has been rebutted.
As noted above, on reviewing the patentee's response to the
examiner's rejection, (D.I. 63, Exh. G), the Court concludes that
the patentee is most reasonably understood as having contemplated
that the limiting data would contain actual threshold viewing
parameters. Nevertheless, the patentee's response to the
examiner was, in fact, focused on how and where the limiting data
is transmitted, not on its actual content. To the extent the
patentee made statements that touch on the actual content of the
limiting data, the Court concludes that these statements were
largely incidental to the core issue of how the data is
transmitted. For instance, the patentee's statement that "the
user's access to the video product is limited in accordance with

data that is transferred concomitantly as part of the down-loaded digital data stream," though revealing some information as to the content of the limiting data, is clearly focused on how the data is transmitted. Where, as here, the patentee's arguments to the examiner were focused on an issue other than the sought after equivalent, the presumption of surrender is rebutted. See Regents of the Univ. of Cal. v. DakoCytomation Cal., Inc., 517 F.3d 1364, 1378 (Fed. Cir. 2008) ("The prosecution history therefore reveals that in narrowing the claim to overcome the prior art rejections, the focus of the patentees' arguments centered on the method of blocking – not on the particular type of nucleic acid that could be used for blocking.").[2]

### b. Whether The Movielink Product Meets The "Decoding" Limitation

#### i. The Parties' Contentions

Movielink also contends that it does not infringe because it does not perform the "decoding said data establishing a limit" step of Claim 1 as construed by the Court. The Court construed this limitation to mean "at the user site, extracting the data establishing a limit for authorized viewing of the video product from the downloaded digital data stream in order to separate the

---

[2] Notably, on reviewing Movielink's Reply in support of its Motion For Summary Judgment, the Court finds that Movielink fails to address APDC's position that the patentee's arguments to the examiner were tangential to the proposed equivalent because they focused on how the limiting data is transmitted rather than the content of the limiting data. (See D.I. 146 at 9.)

19

data establishing the authorized viewing limit from the video product." (D.I. 104 at 21-22.) Movielink argues that even if it is assumed that the KID is limiting data, it still does not perform this step because (1) "reading of the KID value from the movie header does not separate the KID value from the video product" because "the KID value remains in the movie file along with the video data" and (2) "reading of the KID value from the movie header is not an extraction of the value from the incoming digital data stream." (D.I. 129 at 16-17.)

APDC responds that Movielink is erroneously demanding that the Movielink system erase the KID value from the movie file header when it is read from the data stream containing the video product. (D.I. 137 at 24.) According to APDC, there is nothing in the Court's construction requiring deletion of the KID value from the movie file header. APDC further contends that one of skill in the art would understand that, in the context of the patent, a data item may be considered to be "extracted" from a larger set of data even if it is not deleted from its original location. (Id. at 25.)

## ii. Decision

The Court agrees with APDC that Movielink is erroneously attempting to impose a requirement that the limiting data be deleted from the data stream carrying the video product when it is "decoded" from that data stream. Though the Court's

construction calls for "extraction" and "separation" of the
limiting data from the data stream, there is nothing in the
Court's construction calling for it to also be subsequently
deleted from the data stream. In fact, the Court has reviewed
Movielink's claim construction briefing, and sees no indication
that it was even seeking such a limitation during the claim
construction process.[3] Nevertheless, in support of its post hoc
attempt to add such a limitation, Movielink points to a
description in the specification of a preferred embodiment in
which the limiting data is disclosed as being stored in a

---

[3] Indeed, during the Markman hearing, Movielink argued as
follows:

> But in any event, the important thing about this
> decoding is that it is the step in the method where the
> limiting data is pulled out of the digital data stream.
> If you've combined the limiting data and the video
> product into a single digital data stream, then you
> need to have a step where you pull that out and store
> it separately, because you're going to use that
> limiting data, according to the '402 patent, to
> restrict the viewing ability of the customer.

> So that decoding step extracts the limiting data
> out to allow the next step to occur, which is storing a
> result of said decoding step. So Movielink's proposal
> there is storing at the user site the extracted data.

> Part of that is extraction, maybe some sort of
> interpretation of the data. Description of the data.
> Those things could be part of it. But what's essential
> is that you're extracting the data out of that digital
> data stream.

(D.I. 69 at 54:23 - 55:19 (emphasis added).) Thus, Movielink's
construction for this term stems from the requirement that the
limiting data and video product be transmitted together as part
of a single continuous digital data stream, not that it be
subsequently erased from that data stream.

21

register. (See D.I. 129 at 17 (citing '402 patent at 3:56-41)).) The Court has reviewed this portion of the specification and concludes that it contains no material suggesting that the limiting data needs to be deleted from the data stream once it has been extracted.[4] Accordingly, the Court concludes that summary judgment of non-infringement is not warranted on the basis of Movielink or Movielink Manager not performing the "decoding" step of the claim.

> **c.  Whether Movielink Is Entitled To Summary Judgment Of Non-Infringement Because It Does Not Perform All Steps Of The Claim**

> **i.  The Parties' Contentions**

Movielink contends that, other than the "transmitting" step of Claim 1, it simply does not perform the steps of the Claim. Rather, Movielink contends that the other steps of Claim 1 are performed, if at all, by a "user on the user's computer." (D.I. 129 at 18.) For instance, Movielink points to deposition testimony from APDC expert Bruce McNair in which Mr. McNair confirms that "software running on your computer" was responsible for storing the video product at the user site. (See D.I. 130, Exh. B at 93-95; see also id. at 97-98 (Mr. McNair confirms that a process running on the user's computer performs the "decoding"

_____

[4] Notably, on reviewing Movielink's Reply Brief in support of its Motion For Summary Judgment, the Court detects no response to APDC's arguments on this claim term. (See generally D.I. 146.)

step of the Claim); D.I. 130, Exh. B at 104 (Mr. McNair confirms that the Movielink Manager performs the "decoding" step of the Claim).) In these circumstances, APDC contends that it cannot be liable as a direct infringer except under a "joint infringement" theory. However, to be liable under this theory, Movielink maintains, it must have a degree of control over the entities performing the steps of the claim such that it would be vicariously liable for the actions of those entities. (D.I. 129 at 19-20.) Movielink contends that it "is not enough for joint infringement to show merely that two parties were aware of each other or interacted with each other, or that one party provided teaching, instruction, or facilitation for another to participate in a process." (Id. at 20.) Thus, according to Movielink, even if it supplied software for performing certain steps of Claim 1, it cannot be liable as a "joint infringer" because it does "not control its customers' computers, or the software running on them." (Id.)

APDC responds that it has "presented ample evidence in the form of Movielink's own documents that the Movielink Manager software is designed to be continuously running on the user's computer in order to actively monitor whether movie files should be deleted and also operates in a tightly-coupled protocol with Movielink's servers." (D.I. 137 at 20.) For instance, APDC points to a Movielink document explaining that the Movielink

23

system provides "tighter integration" between the Movielink Manager and a Web Commerce Application. (See D.I. 127 at 214.) APDC further contends that Movielink cannot "contract away" liability for infringement and that "Movielink's documents support APDC's claim that the Microsoft DRM acts as part of a unified Movielink system in which Movielink exercises control over each of the components." (D.I. 137 at 21.) In this regard, APDC points to a Movielink document explaining that "DRM systems typically span client and server platforms." (D.I. 127 at 199.)

### ii. Decision

"Infringement requires, as it always has, a showing that a defendant has practiced each and every element of the claimed invention." BMC Res., Inc. v. Paymentech, L.P., 498 F.3d 1373, 1380 (Fed. Cir. 2007). "[W]here the actions of multiple parties combine to perform every step of a claimed method, the claim is directly infringed only if one party exercises 'control or direction' over the entire process such that every step is attributable to the controlling party, i.e., the 'mastermind.' At the other end of this multi-party spectrum, mere 'arms-length cooperation' will not give rise to direct infringement by any party. Muniauction, Inc. v. Thomson Corp., 532 F.3d 1318, 1329 (Fed. Cir. 2008) (internal citations omitted).

Here, as explained above, although Movielink transmits a

24

data stream in a non-infringing manner, the remaining steps of
Claim 1 appear to be performed by the Movielink Manager software
at the user site. APDC does not appear to dispute this point.
(See, e.g., D.I. 137 at 21 (APDC states in Opposition to
Movielink's Motion For Summary Judgment that "APDC has further
shown that the Movielink Manager software component of
Movielink's system itself performs the steps of 'decoding,'
'storing' both the video product and decoded result, and
'blocking access.'").) Thus, the issue before the Court is
whether the Movielink Manager software running on customer's
computers can be, as APDC contends, considered part of a
"unitary" Movielink system that is controlled or directed by a
Movielink "mastermind."

In resolving this question, the Court first notes that
neither the parties nor the Court have identified a case well
matched to the facts of this case. In this regard, the Court
concludes that this case is distinguishable from Global Patent
Holdings, LLC v. Panthers BRHC LLC, 586 F. Supp. 2d 1331, 1335
(S.D. Fla. 2008), a case relied upon heavily by Movielink. In
Global Patent Holdings, the first step of the claim at issue
required the action of a remote computer user. See Global Patent
Holdings, 586 F. Supp. 2d at 1335 ("Plaintiff conceded that the
patented method does not begin until a computer user visits
Defendant's website. If no person ever visited Defendant's

25

website, then Plaintiff's patent would never be infringed.  The
initial step of the '341 patent calls for action on the part of
the remote computer user.").  Claim 1 of the '402 patent, by
contrast, includes no step (such as a step where a user requests
a video product) that must unequivocally be performed by a remote
computer user.  Rather, Claim 1, on its face, merely requires the
operation of components at both a "central station" and a "user
site."  Although this fact is suggestive of two distinct entities
performing the steps of Claim 1, this is not required.
Furthermore, the Court has not identified any authority standing
for the proposition that infringement is avoided merely because
steps of a claimed method are performed in two distinct
locations.

Here, the complicating consideration is that one of the
locations at issue is a "user site" ostensibly consisting of a
computer that is owned and operated by an individual or entity
other than Movielink.  As noted above, the question thus remains
as to whether Movielink retains sufficient control over the
Movielink Manager software running at those sites such that it
could still be liable as a direct infringer.  Movielink asserts
that it "did not control its customers' computers, or the
software running on them . . . ."  (D.I. 129 at 20.)  Movielink's
expert, Dr. Joseph A. Konstan, further opines that "the plain
meaning of 'control' must include the ability to fundamentally

manage or influence the functioning of the thing allegedly being controlled." (D.I. 130, Exh. E ¶ 37.)

In the Court's view, APDC has pointed to sufficient evidence suggesting that Movielink retains control over the Movielink Manager software such that summary judgment on this basis is not warranted.[5] For instance, as noted above, Movielink documentation describes the Movielink Manager as having "tighter integration" with the Web Commerce Application, which Movielink documents describe as "the server" and depict as being involved in the video product licensing process. (See D.I. 127 at 200, 210, 214.) Similarly, in the Court's view, the Movielink Manager software is repeatedly depicted in Movielink documents as being part of an integrated Movielink system made up of a number of highly interrelated components. (See id. at 202-03, 207, 210,

_____

[5] Some of this evidence was referred to in a May 31, 2009 declaration of APDC expert Bruce McNair. Movielink has moved the Court to strike this declaration. (D.I. 135.) Briefly, Movielink contends that this declaration contains opinions that were not present in Mr. McNair's original expert report and that it should thus be stricken pursuant to Fed. R. Civ. P. 26(a)(2)(B). If necessary, the Court may, by separate order, strike the opinions in this declaration and preclude Mr. McNair from opining on the additional documents referred to in this declaration. However, the documents cited in the declaration may well be otherwise admissible as evidence at trial, and, in any event, the Court does not understand Movielink's Motion To Strike as requesting that the underlying documents referred to by Mr. McNair be stricken. Furthermore, in the Court's view, APDC does not generally refer to the additional documents in the context of Mr. McNair's opinion, but in the context of the omnibus appendix of exhibits (D.I. 127) in which they are contained. Accordingly, for the purpose of deciding Movielink's Summary Judgment Motion, the Court will consider the documents referred to in APDC's briefing.

212.) Perhaps most compelling, Movielink's former vice president of web engineering and operations, Bruce Anderson, has testified that Movielink has the continuing capacity to revoke customers' licenses. (Id. at 119-20 ("Movielink, the company, the set of people, are able, using Windows Media DRM, to revoke licenses in support of Exhibit 14, 39680).) To the extent Movielink contends that it does not perform certain steps of Claim 1 because they are instead carried out by Microsoft DRM software, Mr. Anderson has further testified that Movielink "employ[s]" Microsoft DRM software and that Movielink's "system relies" on it. (Id. at 104; see also id. at 187 (Movielink design document referring to "functional coordination of [Movielink Manager] and DRM").) In light of this evidence, the Court cannot conclude that there is no genuine issue of material fact as to whether Movielink exercises continuing control over Movielink Manager and its attendant components, despite the fact that it is running on a customer's computer. Put another way, the Court cannot conclude that there is no genuine issue of material fact as to whether the Movielink Manager software running on customers' computers is simply one component in a distributed – but centrally controlled – Movielink system. In this regard, although Movielink alleges that APDC failed to plead joint infringement, the Court does not see why APDC would be required to invoke joint infringement to

the extent they are proceeding on a theory that the Movielink
service is a single, delocalized system.

## 2. Claim 2

With respect to Claim 2 of the '402 patent, Movielink notes
that APDC's expert, Mr. Bruce McNair, failed to offer an opinion
as to whether the Movielink infringes. In these circumstances,
Movielink contends that it is now entitled to summary judgment of
non-infringement as to this claim. See AquaTex Indus. v.
Techniche Solutions, 479 F.3d 1320, 1329 (Fed. Cir. 2007) ("Even
where literal infringement is involved, expert infringement
testimony is generally required in cases involving complex
technology."). In opposing Movielink's Motion For Summary
Judgment, APDC does not respond to this contention. In fact, on
reviewing APDC's briefing on the parties' competing Summary
Judgment Motions, it appears that APDC fails to mention Claim 2
of the '402 patent. In these circumstances, the Court
understands APDC as having dropped its assertion of Claim 2.
Accordingly, the Court will grant Movielink's Motion to the
extent it seeks summary judgment of non-infringement of Claim 2.

## C. Defendant's Motion For Partial Summary Judgment of Non-Infringement

As set forth above, the Court grants Movielink's Motion for
summary judgment of non-infringement. Accordingly, the Court
will deny APDC's Motion for summary judgment of infringement.

## III. CONCLUSION

For the reasons discussed, the Court will grant Defendant Movielink LLC's Motion For Partial Summary Judgment Of Non-Infringement (D.I. 128) and deny Plaintiff's Motion For Partial Summary Judgment On Infringement (D.I. 124).